[L. A. No. 16595.  In Bank.—July 27, 1939.]

CHARLES McALLISTER et al., Respondents, v. LOUIS C. DRAPEAU, as Building and Loan Commissioner, etc., Appellant.

Robert Lee Collins and Britton Bowker for Appellant.

A. J. Coogan, James M. McGrath, Ewell D. Moore, Clarence M. Condon and Dudley J. Scholten, as *Amici Curiae*, on Behalf of Appellant.

Felix M. Cunningham, Lawrence F. Edmisten, Jr., and John Henry Peckham for Respondents.

Allard, Holbrook & Whyte, Roland J. Brownsberger, O'Melveny, Tuller & Myers, Walter K. Tuller, Louis W. Myers and Pierce Works, as *Amici Curiae*, on Behalf of Respondents.

THE COURT.—Defendant appeals from a judgment cancelling a promissory note and deed of trust executed by plaintiffs, and from a money judgment in favor of plaintiffs for the sums paid by them on the note.

The facts are not in dispute, and are as follows:

In 1929 plaintiffs borrowed from the California Security Loan Corporation, appellant's predecessor in interest, the sum of $11,050, which debt was secured by a first deed of trust on plaintiffs' home property. By the year 1934 this indebtedness had been reduced to $8,271.26. In that year plaintiffs defaulted on their payments on the note, and, as a result, were in imminent danger of losing their home property by sale under or foreclosure of the deed of trust. On or about July 1, 1934, plaintiffs applied to the Home Owners' Loan Corporation for a loan to refinance the indebtedness owed to the California Security Loan Corporation. The H. O. L. C. appraised the property at $8,650, and informed the plaintiffs it was willing to lend them, in cash and bonds of the corporation, the sum of $5,984.38, of which $5,850 was to be used to pay off the California Security Loan Corporation, the balance to be used to pay taxes, escrow fees and title charges. Plaintiffs notified California Security Loan Corporation of the offer. That company informed the plaintiffs, as found by the trial court, that it "would only consent to take said bonds

of H. O. L. C. on the condition that plaintiffs execute a note for $1,300, secured by a second trust deed" on their home property. The California Security Loan Corporation also informed plaintiffs that unless the plaintiffs executed such note and trust deed they would go ahead with foreclosure proceedings under the original trust deed held by them. Under such circumstances, on or about July 16, 1934, the plaintiffs executed the $1300 note secured by a second deed of trust on the property, and delivered the documents to the California Security Loan Corporation. The trial court found that such execution and delivery was made "under threat of foreclosure", and that "the plaintiffs acted as any reasonable and prudent man would act in order to preserve his home property". It was also found that neither plaintiffs nor California Security Loan Corporation informed H. O. L. C. of the fact the $1300 note and second deed of trust had been executed, and that the H. O. L. C. had no notice or knowledge of their existence until shortly before January of 1937 when this present action was instituted.

On August 1, 1934, after securing the $1300 note and second deed of trust from plaintiffs, the California Security Loan Corporation entered into an agreement in writing with the H. O. L. C. to accept H. O. L. C. bonds in the amount of $5,850 in full settlement of its claim against the property. This agreement is entitled "Mortgagees Consent to Take Bonds", is addressed to the H. O. L. C., and reads as follows:

"The undersigned is a holder of a first mortgage or other obligation, which constitutes a lien or claim on the title to the home property of—Charles and Elnora McAllister located at 1171–73½ E. 49th Street Los Angeles California the sum of $...., including unpaid balance of principal and interest, to date.

"Being informed that said owner has made application to Home Owners' Loan Corporation to refund his said indebtedness, the undersigned has considered the method of refunding mortgages provided in Home Owners' Loan Act of 1933, as passed by Congress and approved by the President, *and the undersigned hereby consents, if said refunding can be consummated, to accept in full settlement of the claim of the undersigned the sum of $5,850.00,* face value of the bonds of Home Owners' Loan Corporation, to be adjusted with not exceeding $25 cash *and thereupon to release all the claim of the*

*undersigned* against said property. We agree to accept Bonds in conformance with Home Owners' Act Amendment of April 28, 1934.

"It is understood that the Home Owners' Loan Corporation will incur trouble and expense in connection with its efforts to refund the indebtedness of said home owner, and this consent is executed in consideration of the same and shall be binding for a period of 30 days from date, and thereafter until 10 days written notice shall have been given the State manager of the Corporation."

On August 1, 1934, the H. O. L. C. issued its bonds in the sum of $5,850, and delivered the same to the California Security Loan Corporation. That company released its first deed of trust, and after the H. O. L. C. had recorded its deed of trust, it recorded its second deed of trust. Over a period of time the plaintiffs paid to California Security Loan Corporation $275 on the $1300 note, and then commenced this action against the building and loan commissioner (he having taken over California Security Loan Corporation for purposes of liquidation) to cancel the note and deed of trust, and to recover the amounts paid thereunder.

There are three main questions involved on the appeal. First, does the statute under which H. O. L. C. was organized, or do the rules and regulations adopted pursuant to such statute, expressly or by necessary implication prohibit the creditor from taking secret second liens, when such secret second liens are to secure a part of the very indebtedness refunded by the H. O. L. C.? Second, what is the legal effect of the document entitled "Mortgagees Consent to Take Bonds", above quoted? Third, if the transaction is illegal, should affirmative relief be granted to plaintiffs, participants in the illegal transaction?

The Home Owners' Loan Act of 1933 (48 U. S. Stats. at Large, 128; Title 12 U. S. C. A., sec. 1461 et seq.) declares that the act was passed "to provide emergency relief with respect to home mortgage indebtedness, to refinance home mortgages, to extend relief to the owners of homes occupied by them and who are unable to amortize their debt elsewhere. . . . " Briefly, the act provides that the Federal Home Loan Bank Board is authorized to create a corporation to be known as the Home Owners' Loan Corporation as an instrumentality of the United States. To refinance existing mortgages the

corporation was authorized to issue 4 per cent tax exempt bonds in an aggregate amount not to exceed $2,000,000,000 (later increased to over $4,000,000,000). Originally these bonds were guaranteed by the United States only as to interest, but later the principal was also guaranteed. During the period 1933 to 1936 the corporation was authorized to exchange its bonds for home mortgages in amounts not to exceed $14,000 in any one case, and in any event not to exceed 80 per cent of the appraised value of the real property. The act contemplated that the creditor would, in many cases, accept bonds in an amount less than the indebtedness due him. In that connection the act provides: ''In any case in which the amount of the face value of the bonds exchanged plus accrued interest thereon and the cash advanced is less than the amount the home owner owes with respect to the home mortgage . . . so acquired by the Corporation, the Corporation shall credit the difference between such amounts to the home owner and shall reduce the amount owed by the home owner to the Corporation to that extent.'' The corporation was authorized to amortize its loans to home owners over a fifteen-year period at an interest rate of not to exceed 5 per cent. It was authorized, not only to refinance loans of home owners who were faced with foreclosure, but also to make loans to home owners for the purpose of redeeming or repurchasing home properties already foreclosed or sold under a deed of trust or power of sale. Section 8a of the act provides that every person who ''makes any statement, knowing it to be false, or whoever willfully overvalues any security, for the purpose of influencing in any way the action of the Home Owners' Loan Corporation . . . upon any application, advance, discount, purchase, or repurchase agreement, or loan, under this Act'' shall be guilty of a criminal offense. The act also empowered the board to ''make such by laws, rules and regulations, not inconsistent with the provisions of this section, as may be necessary for the proper conduct of the affairs of the Corporation''. Acting pursuant to this power, the board adopted several resolutions outlining the policy to be adopted towards the making of loans when the creditor insisted on a second mortgage to secure part of the refunded debt. On September 8, 1933, the following resolution was adopted:

"The Corporation may take up second mortgages or other inferior liens, provided the same is done along with the first mortgage and the total is within the Act. The Corporation has no means of preventing the home owner from undertaking to pay any indebtedness he may owe over and above that refunded by the Corporation and has no means of preventing his giving a second mortgage or other security for any such indebtedness. However, State Managers are directed, as a matter of policy in dealing with home owners, to decline to conclude a refunding of a portion of the indebtedness against the home where the home owner is proposing to give a second mortgage for any excess indebtedness he may owe *unless such second mortgage financing is so arranged that the home owner will have a reasonable probability of being able to carry his first mortgage to the Corporation and the second mortgage indebtedness.*"

On November 3, 1933, the following resolution was adopted:

"In the case of bond exchange loans, if the home owner owes more than 80 per cent of the value of his premises he may remain indebted for that portion that the Corporation cannot refund, provided the Corporation secures a first lien, and he may secure the excess indebtedness with a second lien. *However, such refunding will not be carried through unless such excess indebtedness is placed on a payment basis so that the home owner will have a reasonable opportunity to pay the same and meet his obligations to this Corporation.* The Corporation will not proceed to refund indebtedness for mortgagees who insist upon more in face value of bonds or who insist upon any other consideration (such as second mortgage, cash or other consideration) than the net amount owing to such mortgagee, together with accrued (*sic*) interest to date of exchange."

On January 9, 1934, the following resolution was adopted:

"WHEREAS it is the policy of Home Owners' Loan Corporation to endeavor to make complete settlement in the refunding home mortgage indebtedness in all cases where such is possible, and

"WHEREAS second mortgages for excess indebtedness over and above that which the Corporation can refund are permitted only in limited cases and *then only on a basis so that the Home Owner will have reasonable probability of be-*

*ing able to pay his full obligation to the Corporation and meet the terms of such second mortgage indebtedness,* and

"WHEREAS it is necessary for each case to be considered on its merits and in the light of all the circumstances of the property involved and the applicant, therefore

"BE IT RESOLVED by the Board of Directors of Home Owners' Loan Corporation that the following principles be followed in all cases where the Corporation can refund only a portion of the indebtedness against a home:

"(1) If the home owner's income is so reduced that he is unable to meet full amortization payments from the beginning on his obligations to the Corporation, the second mortgage shall not require any principal payments prior to June 13, 1936, and payments thereafter shall be on a schedule which the home owner may reasonably be able to meet.

"(2) In all cases where the home owner is able to meet his full amortization payments to the Corporation from the beginning and is able to make additional payments from the beginning on the second mortgage, then the second mortgage may be amortized from the beginning, provided the payments thereon are not in excess of what the home owner may be reasonably able to pay and at the same time keep his obligation to the Corporation, making full amortization payments.

"(3) In cases where the home owner is a man of substantial means or is a man with substantial prospective income but is temporarily distressed so that it is proper for the Corporation to refund his indebtedness, any second mortgage indebtedness may be placed on any reasonable basis."

It is obvious, from a reading of the statute and the rules and regulations above quoted, that the main and controlling purpose of the act was to assist small home owners who, because of the then existing financial conditions, faced loss of their homes through inability to meet the charges due on mortgages on their home property. It is to be noted that the act places no compulsion, direct or indirect, on the creditor. The creditor had complete liberty of action. If he refused to accept the offer of the H. O. L. C. as to the amount of bonds and cash it would advance to refund the debt, there was nothing the H. O. L. C. or the debtor could do about it. It was contemplated, however, that many creditors would, and experience under the act proved that many did, accept a reduction in the amount of the existing loan in order to secure

liquid assets such as bonds of the H. O. L. C. rather than fore-close on the property and have to hold it until conditions in the real estate market improved. The act provides that such reduction should be passed on to the home owner, the debtor. The rules and regulations contemplated that under some cir-cumstances it would be to the interest of the home owner to give a second mortgage to the creditor to secure a part of the refunded debt, but such rules and regulations provided that the H. O. L. C. would not refund the first mortgage if the creditor demanded a second unless the financial ability of the debtor and the financial arrangements were such that the debtor would have a reasonable opportunity to pay off both mortgages. Obviously, before these facts could be ascertained, a full disclosure of the amount and the terms of the proposed second lien would have to be made to the H. O. L. C. The securing of a second lien by the creditor without such dis-closure is clearly in violation of the letter and spirit of the statute and regulations. This is demonstrated not only by the terms of the statute and the regulations, but also by the language of the agreement above quoted which all creditors were required to sign wherein the creditor represented and agreed that he was accepting the bonds "in full settlement of the claim of the undersigned".

The obtaining of secret second liens by the creditor violates the basic public policy expressed in the act. The act was in-tended solely for the benefit of home owners who were in financial difficulties—no one else was eligible for its benefits. Any benefit to creditors was merely incidental. But if a creditor could lawfully exact a secret second lien from his debtor, in many cases this would confer the benefits of the act on the creditor rather than on the debtor. Thus, in every case where the terms of the secret second lien were such that the debtor was financially unable to pay off both the first and second, the holder of the second, upon default by the debtor, could foreclose his second lien, and the holder of the second would obtain the property subject to the mortgage of the H. O. L. C.—a fifteen-year amortized mortgage at a low rate of interest—a very favorable type of mortgage which at that time was not generally available. In this way the creditor could and would circumvent the policy of the act and would obtain benefits never intended for him. This is not an un-likely possibility when it is considered that the benefits of the

act were only available to home owners who were already in default on their first mortgage.

The above views have been expressed by many courts which have been called upon to decide the validity of secret second liens exacted by the creditor from his debtor as a condition to acceptance of the bonds of the H. O. L. C. Our examination of the authorities has failed to disclose a single case upholding the validity of such secret second mortgage. The various appellate courts which have been called upon to decide the issue have uniformly held that such secret second liens are void and unenforceable. (*Jessewich* v. *Abbene,* 154 Misc. 768 [277 N. Y. Supp. 599]; *First Citizens Bank & Trust Co.* v. *Speaker,* 159 Misc. 427 [287 N. Y. Supp. 831]; Id. 250 App. Div. 824 [294 N. Y. Supp. 737]; *Anderson* v. *Horst,* 132 Pa. 140 [200 Atl. 721]; *Stager* v. *Junker,* 14 N. J. Misc, 913 [188 Atl. 440]; *Chaves County Building & Loan Assn.* v. *Hodges,* 40 N. M. 326 [59 Pac. (2d) 671]; *Cook* v. *Donner,* 145 Kan. 674 [66 Pac. (2d) 587, 110 A. L. R. 244]; *Pye* v. *Grunert,* 201 Minn. 191 [275 N. W. 615, 276 N. W. 221]; *Meek* v. *Wilson,* 283 Mich. 679 [278 N. W. 731]; *United States* v. *Kreidler,* 11 Fed. Supp. 402; see, also, *United States* v. *Kay,* 89 Fed. (2d) 19, decided by United States Supreme Court on other grounds, *Kay* v. *United States,* 303 U. S. 1 [58 Sup. Ct. 468, 82 L. Ed. 607]; *Daniel H. Council* v. *Samuel Cohen,* decided June 26, 1939, by the Supreme Judicial Court of Massachusetts, (Mass.) [21 N. E. (2d) 967]; *Dayton Mortgage & Investment Co.* v. *Theis,* decided May 18, 1939, in the Court of Appeals of Montgomery County, Ohió, (Ohio) [23 N. E. (2d) 511].) In *Bay City Bank* v. *White,* 283 Mich. 267 [277 N. W. 888], and in *Ridge Investment Corp.* v. *Nicolosi,* 15 N. J. Misc. 569 [193 Atl. 710], it was held that second liens taken by the creditor with the full knowledge of the H. O. L. C. are valid. (See, also, *Sirman* v. *Sloss Realty Co., Inc.,* (Ark.) [129 S. W. (2d) 602].) These cases are not in conflict with those first above cited. In *Bay City Bank* v. *White, supra,* and *Ridge Investment Corp.* v. *Nicolosi, supra,* the H. O. L. C. refunded the debt with full knowledge of the existence of the second lien and, presumably, after first ascertaining, in accordance with its regulations, that the debtor could carry both mortgages. The weakness of the instant case is that the existence of the second lien was kept secret from the H. O. L. C. so that it was

induced to make the loan in the belief its mortgage was the only lien against the property. The cases first above cited hold that such secrecy is tantamount to a fraud on the H. O. L. C. The case of *Bank of America* v. *Glick,* decided by the appellate department of the Superior Court of Los Angeles (case No. 470), *certiorari* denied, *Glick* v. *Bank of America Nat. T. & S. Assn.,* 305 U. S. 657 [59 Sup. Ct. 357, 83 L. Ed. 426], is in no way contrary to the conclusions herein stated. From the memorandum opinion rendered by the appellate department of the superior court in that case, it definitely appears that the creditor informed the H. O. L. C., by letter, at the time of signing its consent to take the bonds, that ''The amount we are to receive as mentioned in our amended consent, is less than the total amount of the indebtedness, and the borrowers have agreed to make a satisfactory adjustment of the deficiency.'' This case falls within the rule of the two cases last above referred to.

Several of the courts to which the problem here involved has been presented, in addition to holding the secret second mortgage illegal, have held that in signing the ''Mortgagee's Consent to Take Bonds'', above quoted, the creditor agreed to accept such bonds ''in full settlement'' of his claim, and that such agreement constitutes an accord and satisfaction, a release or a novation. (*Cook* v. *Donner, supra*; *Chaves County Building & Loan Assn.* v. *Hodges, supra*.) The holding of these courts is sound. The agreement signed by the creditor was to accept the bonds ''in full settlement of the claim of the undersigned . . . and thereupon to release all the claim of the undersigned against said property''. The argument of *amici curiae* that this broad language only constitutes an agreement by the creditor to release his security and does not constitute an agreement to release the debt secured is unsound. In the instant case, at the time California Security Loan Corporation signed the consent, the debtor owed it but one debt, which was secured by the recorded first mortgage, and partially secured by the secret unrecorded second mortgage. By signing the consent, that company agreed to release its entire ''claim''. This could have no reasonable meaning other than that it was an unqualified agreement in writing to. release the existing debt for the amount of bonds offered. This constitutes a valid release, and an accord and satisfaction. (Secs. 1524, 1541, Civ. Code.)

The last point urged by appellant is that, admitting the note and second mortgage are void and illegal, the plaintiffs were participants in the illegal transaction, were therefore *in pari delicto,* and cannot, for that reason, secure affirmative relief. It is, of course, true that where parties are *in pari delicto* neither can secure affirmative relief at law or equity. But it is equally true that where one party is involved to some extent in the illegality, but where the second party is grievously at fault and the first party only slightly at fault the court will allow recovery of moneys paid by the first party under the executory contract. (*Smith* v. *Bach,* 183 Cal. 259 [191 Pac. 14] ; *Woodham* v. *Allen,* 130 Cal. 194 [62 Pac. 398] ; *Daniels* v. *Tearney,* 102 U. S. 415 [26 L. Ed. 187].) This exception to the rule has obvious application to the facts of the instant case. The Home Owners' Loan Act was passed solely and exclusively for the benefit of small home owners. The plaintiffs are of that class. In executing the secret second lien they did so under threat of foreclosure. They were not entirely free agents. They faced the loss of their home and were in desperate circumstances. In executing the secret second lien they acted, as found by the trial court, as any reasonable and prudent man would have acted under the circumstances. They were, therefore, not *in pari delicto* with the California Security Loan Corporation. The exception and limitation to the main rule is stated in 1 Pomeroy's Equity Jurisprudence, section 403, page 756, as follows:

"The first of these limitations may be given in the following general formula, and all the others may be regarded as merely particular deductions or corollaries from it. Assuming that a contract is fraudulent, or against public policy, or illegal, still, where the parties to it are not *in pari delicto,* and where public policy is considered as advanced by allowing either, or at least the most excusable of the two, to sue for relief, relief may be given to him, either against the transaction by setting it aside and restoring him to his original position, or even, in some cases, by enforcing the contract, if executory."

The instant case, for reasons already stated, clearly presents a situation where the general rule should not be applied. It should also be mentioned that this illegality argument has no application to the second ground set forth in this opinion,

namely that the "Mortgagee's Consent" constituted a release, and an accord and satisfaction.

It is also urged that the H. O. L. C. is not a party to this appeal, and that it is the only one that can raise the question of illegality. The corporation has presented its views in the action as an *amicus curiae*, and vigorously assails the legality of the transaction.

The judgment appealed from should be and hereby is affirmed.

Rehearing denied.