[No. 28099. *En Banc.* January 2, 1942.]

FRANK T. McVICAR et al., *Respondents*, v. H. C. PETERS
et al., *Appellants*.[1]

*M. M. Pixley,* for appellants.

*Peter Balkema,* for respondents.

ROBINSON, C. J.—Throughout this opinion, for brevity
and convenience, appellants Peters and wife will be
referred to as Peters, and respondents McVicar and
wife as McVicar.

On and prior to March 7, 1934, Peters owned two
certain lots, with a building thereon, encumbered by a
mortgage made in 1923, of which the Puget Sound Sav-

[1]Reported in 120 P. (2d) 485.

ings & Loan Association had become the owner and with respect to which $726.28 of principal was still owing. On July 12, 1923, Peters had contracted to sell the property to A. J. McVicar, who subsequently assigned to the McVicars in this cause. If, on March 6, 1934, McVicar had paid the balance then due on the mortgage, he would have still owed Peters approximately $330, balance on contract.

On March 7, 1934, Peters, for the purpose of enabling McVicar to secure a loan from Home Owners' Loan Corporation, conveyed the property to McVicar by warranty deed, reciting that it was given in the performance of the contract of July 12, 1923. On the same day, McVicar quitclaimed the property to Peters, the deed reciting that it was conveyed "subject to Home Owners' Loan Corporation mortgage of $1,000." On the same day, Peters and McVicar entered into a contract by which Peters agreed to convey to McVicar, subject to the HOLC mortgage, if and when McVicar had paid $325 in monthly installments of five dollars per month, commencing on April 10, 1934, which McVicar agreed to do. The contract, labeled "Purchase Money Receipt," was dated March 10, 1934. The quitclaim deed was not recorded until August 2, 1937.

McVicar's application for a loan from HOLC was granted in the amount of one thousand dollars. The mortgage was issued on April 13, 1934. HOLC issued bonds in the amount of $733.17, which, with a small sum in cash, were delivered in payment of the Puget Sound Savings & Loan mortgage. The balance of the proceeds of the loan went for taxes, assessments, and services. Thereafter, McVicar refused to pay to Peters any of the five dollar installments provided by the contract dated March 10, 1934.

In 1939, McVicar had an opportunity to sell the property, and expended various sums in an attempt to do so.

He was, however, unable to consummate the sale because of the outstanding quitclaim deed which he had given to Peters. He brought this action against Peters to annul the deed and recover $250, with respect to damages alleged to have been caused by Peters' refusal to clear title. Peters cross-complained, praying for judgment for accrued sums due with respect to the contract dated March 10, 1934; and further praying that the quitclaim deed of March 7, 1934, be decreed a mortgage, and that the same be foreclosed as against the McVicars, and all claiming by, through, or under them.

The foregoing, so far as it purports to state facts, is a brief digest of the findings of the trial court. Two of the findings are so material to the major question upon the appeal that we quote them, as follows:

"10. No actual misrepresentation was made by the defendants [Peters], nor were they guilty of active fraud in obtaining such deed and purchase money receipt, the plaintiffs [McVicar] having given no heed whatsoever to the contents of the papers which they were signing."

"13. For the purpose of handling the mortgages held by the Puget Sound Savings and Loan Association, the Home Owners' Loan Corporation established a separate office in charge of its representative, through which the said mortgage refinancing was handled and in each of the instances in which defendants took back second mortgages or deeds and contracts, including the transaction had with plaintiffs herein [McVicar], the said representative of the Home Owners' Loan Corporation had actual knowledge thereof."

The court granted McVicar the recovery prayed for, quieted title against Peters, and entered judgment for $250. That result was consequent upon the trial court's following conclusion of law:

"1. Said quitclaim deed executed by the plaintiffs McVicar on or about March 7, 1934, and recorded in Volume 1747 of Deeds at page 22 of the records of the

county auditor of King County, Washington, said earnest money receipt and said alleged oral contract were contrary to the spirit and intent of said Act of Congress, were contrary to public policy and are void and unenforceable."

The respondents contend that:

"Refinancing under the Home Owners' Loan Act constitutes a refunding of all liabilities of the borrower which are a lien or charge on the home being financed."

The trial court seems to have adopted that view. In its memorandum opinion, it said:

"I don't know how you are going to refinance anything unless you do refinance it. Refinancing a part of a debt and leaving the other part still hanging on the man is not a refinancing. I think that is why these courts, all the courts except one or two, I think, that I have been cited, hold what has been done here, though I am not able to find any fraud at all,—that what has been done here is contrary to public policy."

The opinion in *Lavery v. Rizza*, 126 Conn. 132, 9 Atl. (2d) 819, a case decided in December, 1939, points out that the following is one of the regulations of the HOLC:

"Second Mortgages—Where the full amount of the indebtedness against the property cannot be refunded by the Corporation, the mortgagee or other lien holder will be permitted to take a second mortgage or second deed of trust if the amount of such second mortgage or deed of trust does not exceed the difference between the Corporation's appraisal and the amount of the Corporation's first mortgage. In no case shall the second trust or second mortgage to such other mortgagee or lien holder be in terms which would cause the mortgagor's payments to the Corporation to be a hardship, or deprive the mortgagor of reasonable opportunity to pay such second mortgage or second trust."

The opinion in the *Lavery* case cites many decisions bearing on the question under discussion, and quotes, with approval, the following from the case of *Ridge*

*Inv. Corp. v. Nicolosi,* 15 N. J. Misc. 569, 193 Atl. 710, as follows:

"We are unable to agree with the contention of the appellants that agreements for payments over and above the amount of the Home Owners' Loan Corporation mortgage are entirely void and illegal. The most favorable view of the statute and the cases thereunder cited would be that fraudulent agreements, made in collusion to induce the granting of the mortgage loan by the corporation, are unenforceable. As stated, the factual finding here is that there was no fraud or collusion, and that the arrangement was openly made with the knowledge of all parties, including the representative of the corporation."

As to the case before it, the Connecticut supreme court of errors said:

"In the case before us both the HOLC mortgage and the Mannino mortgage were prepared in the office of a company which, as regards the former, was acting for the HOLC, and the entire transaction was completed on the same day. While the finding is not explicit as to the authority of the Kelsey Company, as the agent of the HOLC, the evidence brought before us by the defendants in the effort to correct this part of the finding is that the Kelsey Company made the arrangements and closed the deal. The knowledge it had of the mortgage to Mannino must have come to it in the very course of the performance of its agency for the HOLC in securing the mortgage it took. Under such circumstances that knowledge is to be imputed to the HOLC. *MacKay v. Aetna Life Ins. Co.,* 118 Conn. 538, 549, 173 Atl. 783; Restatement, 1 Agency, § 274. The case is, then, one where it must be held that the HOLC took the first mortgage with knowledge that the second mortgage was to be given to Mannino. Under such circumstances the latter mortgage was not invalid as against public policy."

These cases, together with cases therein cited, and many others which could be cited, show that the broad contention that a second mortgage, taken in connection

with an HOLC refinancing, is *ipso facto* void as against public policy, is wholly untenable. If there can be said to be a general rule to that effect—which we doubt—it is manifestly subject to exceptions.

Respondents, in support of their claim that the quitclaim deed and agreement contained in the instrument called the purchase money receipt were void, cite a great number of cases, of which the following are typical: *Meek v. Wilson,* 283 Mich. 679, 278 N. W. 731; *Markowitz v. Berg,* 125 N. J. Eq. 56, 4 A. (2d) 410; *Anderson v. Horst,* 132 Pa. Super. Ct. 140, 200 Atl. 721; *Chaves County Building & Loan Ass'n v. Hodges,* 40 N. M. 326, 59 P. (2d) 671; *McAllister v. Drapeau,* 14 Cal. (2d) 102, 92 P. (2d) 911, 125 A. L. R. 800; *Council v. Cohen,* 303 Mass. 348, 21 N. E. (2d) 967.

Many quotations can be selected from these opinions which appear to strongly support respondents' contention, but, as authorities with respect to the specific question before us, the cases are of little or no value. In each of them, the mortgagee accepted HOLC bonds in an amount somewhat less than the debt, having signed a "Consent to Take Bonds" which recited that they were accepted in full settlement, and then took a second mortgage from the home owner mortgagor to cover the deficiency. This was done without the knowledge of the HOLC's representative; in some of the cases, with great secrecy, and in at least one of them the second mortgage was extorted by a threat to prevent the consummation of the proposed HOLC loan unless it was given. Those cases are based upon fraud, and, although there are cases to the contrary—see, for example, *McMillan v. Palmer,* 198 Ark. 805, 131 S. W. (2d) 943—clearly represent the weight of authority upon such a state of facts.

In this case, however, Peters did not receive any HOLC bonds, nor did he enter into any agreement

with HOLC, or with anyone else, to relinquish his claim against McVicar for the balance due him on the purchase and sale contract of July 12, 1923. Furthermore, as we have seen, the trial court found that Peters was not guilty of fraud or concealment, and that the representative of HOLC had actual knowledge of the side arrangement with McVicar. The law applying to such a state of facts is that laid down in *Lavery v. Rizza*, from which we have above quoted at length. See, in addition to the cases cited in that opinion (126 Conn. 132, 137, 9 A. (2d) 819, 821), *Shiver v. Liberty Building-Loan Ass'n*, 16 Cal. (2d) 296, 106 P. (2d) 4, in which the earlier California case, relied on by respondents, *McAllister v. Drapeau, supra,* is distinguished. See, also, *Ganchoff v. Bullock*, 234 Wis. 613, 291 N. W. 837, and the very recent case of *Brown v. Sears, Roebuck & Co.*, 311 Ill. App. 490, 36 N. E. (2d) 612, decided October 7, 1941.

When the trial court held that the HOLC had actual knowledge of Peters' arrangement with McVicar—and the evidence is conclusive to that effect, barring a contention which will be hereinafter discussed—the instant case was brought under the rule of the decisions cited in the preceding paragraph; for, since Peters informed HOLC of the proposed arrangement with McVicar, he was guilty of no fraud as to the corporation.

"At all events, however, the full duty of creditors who propose to retain a lien upon portions of the debtor's property is discharged if HOLC is advised of the situation so that if proper it may decline the loan unless the plans of the creditors are abandoned or modified. Hence, it is the secret mortgage, collusively agreed for, that is void as against public policy because it has deprived HOLC of the data upon which its decision to loan must be based if it is to carry out the beneficent purposes of the law." *Ganchoff v. Bullock, supra.*

It cannot be reasonably contended that Peters defrauded McVicar, for McVicar, in the purchase money receipt, merely agreed to pay Peters the money he then actually owed Peters; that is, the balance remaining due on the contract of July 12, 1923. But we may drop this point, since the trial court expressly found that there was no fraud.

Finally, respondents contend, in a black letter headline in their brief:

"That an employee of the H.O.L.C., whose authority was not ascertained nor proved, did know of the quit claim deed did not validate it."

This would be a very pertinent point in an action by HOLC to annul the transaction it had with McVicar, or with Peters, if it had had any transaction with him. But, under the authorities which we have already discussed, Peters is in no need of a validation by the HOLC of his transaction with McVicar. It being apparent that he had not defrauded McVicar, it was merely necessary for him to show that his transaction with McVicar was not fraudulent as to the HOLC. We take it that this was the purpose appellants' attorney had in mind when he made the following offer:

"MR. PIXLEY: I wish to recall Mr. Peters for further examination. He will testify that at the time this deed and contract was given the representative in charge of the Home Owners Loan office knew of his arrangement with McVicar, that the Home Owners Loan Corporation at that time had established a separate office for the purpose of handling exclusively the re-financing of mortgages held by Puget Sound Savings & Loan Association, that the representative in charge of this office made no objection to any of the cases in which he took second mortgages but told him he should take mortgages instead of deeds and contracts. MR. BALKEMA: I will admit that if recalled the witness will so testify but I object to the offered testimony on the ground it is irrelevant and immaterial. MR. PIXLEY:

Please take the stand, Mr. Peters. THE COURT: He doesn't need to testify, Mr. Balkema admits he will so testify."

The question is not what authority did the HOLC representative have to perform a certain act for his principal, but—Is the knowledge which a local representative of the HOLC acquires in making an HOLC loan imputable to his principal? That question is, we think, satisfactorily answered in one of the quotations made from *Lavery v. Rizza* early in this opinion. A negative answer would, obviously, be absurd. This great corporation carries on business in every state of the Union and with literally millions of people. The head office at Washington could not possibly have actual knowledge of the details of all of these transactions, or of everything that its representatives learn in dealing with its customers. If the knowledge of the representatives of the corporation, acquired while making loans in its behalf, be not imputable to the corporation, how could anyone safely transact business with the corporation at a local office?

Having arrived at the conclusion that the quitclaim deed and the contract called a purchase money receipt were void, the trial court, of course, did not find it necessary to go any further, and, consequently, there are issues in the case remaining undetermined.

The judgment and decree appealed from is reversed. The case is remanded to the trial court, with directions to treat the quitclaim deed and purchase money receipt as valid instruments, and, starting from that point, to enter such a judgment as it finds warranted by the evidence.

ALL CONCUR.