[Civ. No. 18378. Second Dist., Div. Three. Feb. 27, 1952.]

FRANKLIN C. BOOSMAN et al., Appellants, v. UNITED BUILDING COMPANY (a Corporation) et al., Respondents.

Culbert L. Olson, John W. Olson and John H. Carter for Appellants.

Gustave L. Goldstein for Respondents.

VICKERS, J. pro tem.—■■■ Prior to and on March 2, 1945, the defendants, who are the respondents herein, were the obligors and the Bank of America National Trust and Savings Association was the beneficiary under a trust deed upon the single family residence property involved in this

proceeding. This trust deed was insured under the provisions of the National Housing Act (12 U.S.C.A. § 1701 et seq.) which will hereinafter be referred to for convenience as the N.H.A. The trust deed provided for a premium ·charge of one half of 1 per cent per annum for the insurance of the trust deed under the act, for interest at the rate of $4\frac{1}{2}$ per cent per annum and for the payment of the principal, interest and charges in monthly installments.

From January 2, 1945, to March 2, 1945, the plaintiffs, who are the appellants herein, occupied the property in question under a rental agreement with defendants providing for a rental of $50 per month. On March 2, 1945, the plaintiffs and defendants executed an "Agreement for the Sale of Real Estate" whereby the plaintiffs became the vendees and the defendants the vendors of the property in question. This agreement provided for a purchase price of $6,150, a down payment of $295, interest at the rate of 6 per cent per annum and amortized monthly payments of $50. Forty dollars and forty cents of each monthly payment was to be credited upon interest and principal and $9.60 upon taxes, assessments, mortgage-insurance and fire insurance. The agreement also provided that the buyer had no right to make payments in excess of the fixed monthly payments or to make any prepayments without the consent of the vendor and that the vendor would execute and deliver a good and sufficient grant deed upon compliance by the vendee with all the terms and conditions of the agreement.

The complaint is in the form of an action for reformation of the agreement as well as for declaratory relief. However in their briefs on appeal the plaintiffs state that this is not an action for reformation on the ground of fraud or mistake but rather that it is for the purpose of having the court declare certain provisions of the agreement illegal and void and that the contract be read without such provisions. It is plaintiffs' contention that the provisions in question are illegal and void because they are contrary to the purposes and policies of the N.H.A. and that plaintiffs are entitled to all the benefits of the insured trust deed loan to which defendants and the Bank of America National Trust and Savings Association are parties. The plaintiffs contended in the trial court that they were entitled to the following declarations: That the interest rate was $4\frac{1}{2}$ per cent instead of 6 per cent; that they had the right to make such prepayments on

the principal as they desired without the consent of defendants; that title to the property was then in plaintiffs without the necessity of their first complying with all the terms and conditions of the agreement; and that they be substituted in place of the defendants as obligors under the insured trust deed without the consent of the defendants. The plaintiffs also asked the trial court to declare illegal and void a portion of the agreement whereby the plaintiffs agreed "not to permit the occupancy of said property except by one family consisting of no more than four (4) persons." The trial court found plaintiffs were entitled to no relief and gave judgment that they "take nothing by their action."

Appellants complain because the "trial court did not render a decision declaring the rights and duties of the parties." However there was no contention that the questioned provisions of the agreement were vague, uncertain or ambiguous or that there was any dispute between the parties as to their interpretation. The court found that the charging allegations of the complaint were not true and against the appellants' contentions that the provisions were illegal or void. It thus disposed of the only real question before it and therefore properly adjudged that appellants take nothing. Respondents assert that no evidence was offered or received to support the allegations of the complaint, which were denied by the answer, that there was a dispute between the parties as to the provision of the agreement which limited the occupancy of the premises to four persons. We find none in the statement on appeal. It therefore does not appear that a present controversy existed in this regard or that conditions existed which would justify the court in exercising its discretionary powers to grant such declaratory relief. The burden of proof was on the plaintiffs to establish such facts. Having failed to carry this burden they have no cause to complain of the lack of declaration thereof by the court (see *Merkley* v. *Merkley*, 12 Cal.2d 543, 547 [86 P.2d 89].)

The validity of provisions of the character complained of when contained in the normal agreement for the sale of real estate, has been firmly established in this state. Appellants' only ground for attack thereon is based on the contention that these provisions "violate the intent, purpose and public policy of the National Housing Act as amended." They assert that it was the intent, purpose and public policy of the act that the purchaser of the property from the

mortgagor was entitled to the same favorable terms and conditions that were contained in the insured mortgage thereon. However they fail to call our attention to any portion of the act, as it read prior to 1950, that supports this assertion. The N.H.A. was first adopted in 1934 as Public Law No. 479, 73d Congress. Thereafter the act was amended from time to time prior to March 2, 1945, the principal amendments being adopted in 1938, 1941 and 1942. The act is found in U.S.C.A. title 12, sections 1701 to 1750 inclusive. Under the act the term "Mortgage" includes trust deed and the terms "mortgagee" and "mortgagor" include beneficiary and trustor respectively (see §§ 1707 and 1736). Section 1702 provides in part as follows: "The President is authorized to create a Federal Housing Administration, all of the powers of which shall be exercised by a Federal Housing Administrator (hereinafter referred to as the 'Administrator'). . . ." Section 1703 as it read on March 2, 1945, provided in part as follows: "(a) The Administrator is authorized and empowered upon such terms and conditions as he may prescribe, to insure banks, trust companies, personal finance companies, mortgage companies, building and loan associations, installment lending companies and other such financial institutions, which the Administrator finds to be qualified by experience or facilities and approves as eligible for credit insurance, against losses which they may sustain as a result of loans and advances of credit, and purchases of obligations representing loans and advances of credit, made by them on and after July 1, 1939, and prior to July 1, 1947, for the purpose of financing alterations, repairs, and improvements upon or in connection with existing structures, and the building of new structures, upon urban, suburban, or rural real property. . . .

"(g) The Administrator is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter."

In 1938 section 1709 was amended so as to require that the mortgagor be also the owner and occupant of the property. Subsection (b)(2)(B) of that section provided in part as follows: "Provided, That with respect to mortgages insured under this paragraph the mortgagor shall be the owner and occupant of the property at the time of the insurance and shall have paid on account of the property at least 10 per centum of the appraised value in cash or its equivalent. . . ." The mortgage here involved was not insured under this section.

In 1941 the N.H.A. was amended by the addition of sub-chapter VI entitled "War Housing Insurance." These amendments are found in 12 U.S.C.A. (1946), sections 1736 to 1743 inclusive. In their brief on appeal the respondents assert that the trust deed in question was insured under section 1738. This is not denied by appellants and being supported by such facts as have been called to our attention we will accept it as true. Section 1938 provided in part as follows: "(a) The Administrator is authorized, upon application by the mortgagee, to insure as hereinafter provided any mortgage which is eligible for insurance as hereinafter provided and upon such terms as the Administrator may prescribe to make commitments for the insuring of such mortgages prior to the date of their execution or disbursement thereon: *Provided,* That the property covered by the mortgage is in an area or locality in which the President shall find that an acute shortage of housing exists or impends which would impede war activities. . . .

"(b) To be eligible for insurance under this section a mortgage shall——

"(1) have been made to, and be held by, a mortgagee approved by the Administrator as responsible and able to service the mortgage properly;

"(2) involve a principal obligation . . . in an amount not to exceed 90 per centum of the appraised value . . . of a property. . . . Such principal obligation shall not exceed——

"(A) $5,400 if such dwelling is designed for a single-family residence . . .

"(3) have a maturity satisfactory to the Administrator but not to exceed twenty-five years from the date of the insurance of the mortgage;

"(4) contain complete amortization provisions satisfactory to the Administrator;

"(5) bear interest (exclusive of premium charges for insurance) but not to exceed 5 per centum per annum on the amount of the principal obligation outstanding at any time, or not to exceed 6 per centum per annum if the Administrator finds that in certain areas or under special circumstances the mortgage market demands it;

"(6) provide, in a manner satisfactory to the Administrator, for the application of the mortgagor's periodic payments (exclusive of the amount allocated to interest and to the premium charge which is required for mortgage insurance

as herein provided) to amortization of the principal of the mortgage; and

"(7) contain such terms and provisions with respect to insurance, repairs, alterations, payment of taxes, default reserves, delinquency charges, foreclosure proceedings, anticipation of maturity, additional and secondary liens, and other matters as the Administrator may in his discretion prescribe.

"(c) . . . In the event that the principal obligation of any mortgage accepted for insurance under this subchapter is paid in full prior to the maturity date, the Administrator is further authorized in his discretion to require the payment by the mortgagee of an adjusted premium charge in such amount as the Administrator determines to be equitable, but not in excess of the aggregate amount of the premium charges that the mortgagee would otherwise have been required to pay if the mortgage had continued to be insured under this subchapter until such maturity date; and in the event that the principal obligation is paid in full as herein set forth, and a mortgage on the same property is accepted for insurance at the time of such payment, the Administrator is authorized to refund to the mortgagee for the account of the mortgagor all, or such portion as he shall determine to be equitable, of the current unearned premium charges theretofore paid. The Administrator is further authorized to prescribe such procedures as in his judgment are necessary to secure to *war workers occupancy priority* with respect to properties which have not been previously occupied and which are covered by mortgages insured under this section and section 1743 of this title." (Italics ours.)

It appears that the purpose of N.H.A. of 1934 was to stimulate the repair of existing housing and the erection of additional and new housing by encouraging financial institutions to loan the necessary money. The effect of the 1938 amendment to section 1709 was to restrict the benefits of that section to mortgagors who were owners and occupants of the property in question. This restriction was not imposed by the 1941 and 1942 amendments as contained in subchapter VI. These amendments evidence a continuation of the purpose of stimulating the erection of residential housing, but limited it to areas or localities in which "an acute shortage of housing exists or impends which would impede war activities." At the time of the adoption of these amendments Congress found the country on a war basis, with rapidly expanding war

industries which required the services of large segments of our population theretofore engaged in other pursuits. These industries were for the most part centered in localities in which the facilities were wholly inadequate to house the necessary thousands of new employees, most of whom were to be brought from other areas. If the essential war goods were to be produced it was necessary that housing conditions be created that would accommodate these war workers. Congress was primarily interested in the providing of such housing in large quantities and as soon as possible. It was interested in occupancy rather than ownership. It apparently was of little if any interest to it whether the war workers owned, rented or purchased the provided housing. It therefore placed no restrictions on the sale of the property either as to price, the amount of the down payment or the terms and conditions. In 1941 and 1942 Congress may also have had in mind that at the end of the war emergency the operations of the war industries would be greatly curtailed and that most of the occupants of the newly created housing would be forced to move to other localities to seek employment. Further that this would greatly reduce the demand for such dwellings and might well result in those who were occupying them abandoning their contracts of purchase. If the selling organizations, who were mortgagors under insured mortgages, were to be encouraged to sell on small down payments and low monthly installments and thus bring such property within the financial means of war workers it was only fair to permit such organizations to make such terms with the prospective buyers as would protect their investment. It is apparent from a reading of section 1738 that the purpose of the amendment was to be accomplished by securing mortgagees who were responsible and who could service the mortgages and by securing mortgagor organizations who were capable of subdividing large tracts of land and erecting many houses thereon. Among the organizations who responded were the respondents. They erected 425 or more houses, one of which was sold to the appellants.

It is significant that neither the 1934 act nor any of the amendments thereto, before that of 1950, makes any reference to the ultimate purchasers or to the terms of purchase and none to the occupiers except in the last part of section 1738, subsection (c), quoted above and in section 1709. The only such reference in section 1938 is to "occupancy priority." Section 1709 contains many provisions similar to those quoted

above from section 1703 and section 1738 but was limited to owner occupants.

Section 1742 of subchapter VI of the act provided as follows: "The administrator is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter." Respondents assert in their briefs that the Administrator has made no rules or regulations covering the terms or conditions under which sales of properties covered by insured mortgages could be made. Appellants have not denied this assertion and the record on appeal contains nothing that indicates that the Administrator has done so. The fact that the Administrator has made no such rules or regulations indicates an administrative construction which supports respondents' contention that appellants are not entitled under the act to the benefit of the terms and conditions of the insured trust deed and to have them substituted in place of the corresponding portions of the agreement for sale of real estate.

Appellants cite the cases of *McAllister* v. *Drapeau,* 14 Cal. 2d 102 [92 P.2d 911, 125 A.L.R. 800], and *Young* v. *Hampton,* 36 Cal.2d 799 [228 P.2d 1], in support of their contentions. However neither of these cases nor the congressional acts construed therein are analogous to the present case or to the N.H.A. In *McAllister* v. *Drapeau, supra,* the plaintiffs had borrowed a sum of money from the Home Owners Loan Corporation to pay off a trust deed, in favor of defendant's predecessor in interest, under which it was in default, and had been required by defendant's predecessor to secretly execute a second trust deed in its favor for an additional sum. The court held that this second trust deed was void in that it violated the letter and spirit of the Home Owners' Loan Act of 1933 (48 Stats. 128; 12 U.S.C.A., § 1461 et seq.) That act declares that its purpose is "To provide emergency relief with respect to home mortgage indebtedness, to refinance home mortgages, to extend relief to the owners of homes occupied by them and who are unable to amortize their debts elsewhere. . . ." Section 1462, U.S.C.A., declares that under the act "(c) The term 'home mortgage' means a first mortgage on real estate . . . upon which there is located a dwelling . . . which is used in whole or in part by the owner as a home or held by him as his homestead. . . ." It is apparent that the purpose of the Home Owners' Loan Act was to protect and assist small home owners who were unable to meet their mortgage obligations and faced the loss of their homes. No

such purpose appears in or can be fairly implied from section 1738 of the N.H.A. As we have seen its purpose was to stimulate the financing and erection of housing in great quantities, and in areas where industries were located. The Federal Home Loan Bank Board recognized the purpose of the Home Owners' Loan Act and under the power given it by the act to "make such by laws, rules and regulations . . . as may be necessary for the proper conduct of the affairs of the corporation" adopted several regulations to protect the mortgagor. One adopted November 3, 1933, provided: " ' . . . However, such refunding will not be carried through unless such excess indebtedness is placed on a payment basis so that the home owner will have a reasonable opportunity to pay the same and meet his obligations to this Corporation. . . .' " Another regulation adopted January 9, 1934, recited: " 'WHEREAS second mortgages for excess indebtedness over and above that which the Corporation can refund are permitted only in limited cases and then only on a basis so that the Home Owner will have reasonable probability of being able to pay his full obligation to the Corporation and meet the terms of such second mortgage indebtedness. . . .' " In the course of its opinion the Supreme Court referred to these regulations and to portions of the act, including those set out above. It likewise recognized the purpose of the act. At pages 108 and 109 appears the following: "It is obvious, from a reading of the statute and the rules and regulations above quoted, that the main and controlling purpose of the act was to assist small home owners who, because of the then existing financial conditions, faced loss of their homes through inability to meet the charges due on mortgages on their home property. It is to be noted that the act places no compulsion, direct or indirect, on the creditor. The creditor had complete liberty of action. If he refused to accept the offer of the H.O.L.C. as to the amount of bonds and cash it would advance to refund the debt, there was nothing the H.O.L.C. or the debtor could do about it. It was contemplated, however, that many creditors would, and experience under the act proved that many did, accept a reduction in the amount of the existing loan in order to secure liquid assets such as bonds of the H.O.L.C. rather than foreclose on the property and have to hold it until conditions in the real estate market improved. The act provides that such reduction should be passed on to the home owner, the debtor. The rules and regulations contemplated that under some circumstances it would

be to the interest of the home owner to give a second mortgage to the creditor to secure a part of the refunded debt, but such rules and regulations provided that the H.O.L.C. would not refund the first mortgage if the creditor demanded a second unless the financial ability of the debtor and the financial arrangements were such that the debtor would have a reasonable opportunity to pay off both mortgages. Obviously, before these facts could be ascertained, a full disclosure of the amount and the terms of the proposed second lien would have to be made to the H.O.L.C. The securing of a second lien by the creditor without such disclosure is clearly in violation of the letter and spirit of the statute and regulations. This is demonstrated not only by the terms of the statute and the regulations, but also by the language of the agreement above quoted which all creditors were required to sign wherein the creditor represented and agreed that he was accepting the bonds 'in full settlement of the claim of the undersigned.'

"The obtaining of secret second liens by the creditor violates the basic public policy expressed in the act. The act was intended solely for the benefit of home owners who were in financial difficulties—no one else was eligible for its benefits."

In *Young* v. *Hampton, supra,* 36 Cal.2d 799 [228 P.2d 1], the defendant Hampton, a veteran of World War II, entered into negotiations with the plaintiff, a building contractor, for the erection of a home. The defendant applied for a loan from a bank under the provisions of the Servicemen's Readjustment Act (38 U.S.C.A., § 694a). The Veterans Administration appraised the buildings at $8,285 and the parties executed a contract whereby plaintiff agreed to construct the buildings for that amount with a verbal agreement for the defendant to pay her $9,000. Shortly thereafter they executed another contract to supersede it whereby defendant agreed to pay plaintiff the cost of construction plus 10 per cent, the total not to exceed $9,000. The first contract was delivered to the bank with defendant's note and trust deed, but the second one was kept secret from both the bank and the Veterans Administration. The bank during the course of construction paid four installments to plaintiff in accordance with the original contract. Under defendant's instruction it failed to pay the fifth installment. Plaintiff sued to enforce her mechanic's lien and the court held that the promise to pay the excess above the $8,285 appraisal figure was void. Section 694a provides as follows: "(a) Any loan made to a veteran under this subchapter, the proceeds of which are to

be used for purchasing residential property or constructing a dwelling to be occupied as his home . . . is automatically guaranteed if made pursuant to the provisions of this subchapter, including the following:

"(1) That the proceeds of such loan will be used for payment of the property purchased or constructed or improved;

"(2) That the contemplated terms of payment required in any mortgage to be given in part payment of the purchase price or the construction cost bear a proper relation to the veteran's present and anticipated income and expenses; and that the nature and condition of the property is such as to be suitable for dwelling purposes; and

"(3) That the price paid or to be paid by the veteran for such property or for the cost of construction, repairs, or alterations does not exceed the reasonable value thereof as determined by proper appraisal made by an appraiser designated by the Administrator." It is apparent that the purpose of the act was to assist and protect veterans who desired homes for themselves. It specifically protected them from undertaking a financial obligation they could not reasonably meet by prohibiting the price paid or the cost of construction from being more than the appraised value. This purpose, as in the case of that of the Home Owners' Loan Act is quite different from the purpose of the N.H.A. In its opinion the Supreme Court at page 804 quoted from *Diamond* v. *Willett*, (La.App.) 37 So.2d 338 as follows: " 'The acts of Congress herein referred to [Servicemen's Readjustment Act] are designed to give relief to members of the armed forces, of limited means, who honorably served their country during World War II. It was realized by Congress that no greater duty rested upon it than to aid and encourage, in substantial ways, the establishment of homes by those who had loyally served the Government in its hour of peril. One of the several modes adopted to attain this desired end is reflected from the passage of laws that unequivocally insure against financial loss those persons who invest in notes of ex-service men, secured by mortgages on homes acquired by them. Before said insurance can become effective in any given case, inquiry is made concerning the ability of the ex-service man to repay the mortgage debt, and care is exercised to protect him against the assumption of obligations he might default upon eventually. For this reason, it is imperative that the correct sale price of a home be declared in the application for assistance.' " At pages 805

and 806 the Supreme Court said: "By section 694a of that statute, the government endeavors to assure terms of payment which bear a proper relation to the veteran's present and anticipated income and expenses. The requirement · of the same section that the price to be paid by the veteran for the cost of construction shall not exceed the reasonable value as established by a designated appraiser was obviously enacted to protect the borrower from acquiring property at an exorbitant price. That this was the legislative intent is manifest from the discussions at the time enactment of the statute was being considered. . . .

"Manifestly, the entire transaction was designed to evade the provisions of the act and also to obtain its benefits. The statute was intended solely to aid the veteran in the establishment of a home. Any benefit to a contractor was incidental. However, if a secret contract for an amount in excess of the appraised value may be exacted from a veteran, the purpose of the act is defeated."

It is apparent from the above recitals and quotations that the facts in *McAllister* v. *Drapeau, supra,* 14 Cal.2d 102, and *Young* v. *Hampton, supra,* 36 Cal.2d 799, are not analogous to the facts in the present case, that neither of the purposes of the Home Owners' Loan Act and the Servicemen's Readjustment Act was the purpose of section 1738 of the N.H.A., and that considerations which guided the Supreme Court in those cases do not apply to the present case.

On April 20, 1950, Congress adopted the following amendment to the N.H.A. (64 Stats. 81, 12 U.S.C.A., § 1701*l*): "It is the intent of Congress that no sale of a dwelling on which a mortgage is insured under this chapter, shall be financed, while such mortgage is so insured, at an interest rate higher than that prescribed by the Federal Housing Commissioner. It is the further intent of Congress that no such sale shall be made, while such mortgage is so insured, on terms less favorable to the purchaser as to amortization, retirement, foreclosure, or forfeiture than those contained in such mortgage." Appellants contend that by virtue of this amendment Congress "declared what is and has always been the purpose and policy of the . . . National Housing Act." However the opening words of the amendment "*It is the intent of Congress . . .*" clearly speak of the intent as of the date of its adoption. (Italics ours.) The 1950 Congress made no attempt to declare what the intent of the various Congresses had been at the time of the original enactment of the N.H.A. in 1934 or at

the times when the various amendments thereto were adopted. In view of the many changes in congressional offices that had occurred during the intervening 16 years the 1950 Congress could hardly have done so even though it assumed it had such power. This amendment did not have or purport to have any retroactive effect nor is it a guide to the discovery of the intent with which the N.H.A. and the prior amendments were adopted.

Our determination in favor of respondents of the principal issues raised by the answer to the complaint makes it unnecessary for us to further consider the issues raised by the affirmative defenses.

The order denying the motion for a new trial being an unappealable order the appeal therefrom is dismissed.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 24, 1952. Carter, J., was of the opinion that the petition should be granted.