## WOODS, HOUSING EXPEDITER, v. CLOYD W. MILLER CO. ET AL.

No. 486. Argued February 6, 1948.—Decided February 16, 1948.

*Solicitor General Perlman* argued the cause for appellant. With him on the brief were *Robert L. Stern, Robert W. Ginnane, Irving M. Gruber* and *Ed Dupree.*

*Paul S. Knight* argued the cause and filed a brief for appellees.

Mr. Justice Douglas delivered the opinion of the Court.

The case is here on a direct appeal, Act of August 24, 1937, 50 Stat. 752, 28 U. S. C. § 349a, from a judgment of the District Court holding unconstitutional Title II of the Housing and Rent Act of 1947. 61 Stat. 193, 196.

The Act became effective on July 1, 1947, and the following day the appellee demanded of its tenants increases of 40% and 60% for rental accommodations in the Cleveland Defense-Rental Area, an admitted violation of the Act and regulations adopted pursuant thereto.[1] Appel-

---

[1] Section 204 (b) of the Act provides that "no person shall demand, accept, or receive any rent for the use or occupancy of any controlled housing accommodations greater than the maximum rent established

lant thereupon instituted this proceeding under § 206 (b) of the Act [2] to enjoin the violations. A preliminary injunction issued. After a hearing it was dissolved and a permanent injunction denied.

The District Court was of the view that the authority of Congress to regulate rents by virtue of the war power (see *Bowles* v. *Willingham*, 321 U. S. 503) ended with the Presidential Proclamation terminating hostilities on December 31, 1946,[3] since that proclamation inaugurated "peace-in-fact" though it did not mark termination of the war. It also concluded that, even if the war power continues, Congress did not act under it because it did not say so, and only if Congress says so, or enacts provisions so implying, can it be held that Congress intended to exercise such power. That Congress did not

---

under the authority of the Emergency Price Control Act of 1942, as amended, and in effect with respect thereto on June 30, 1947." Controlled Housing Rent Regulation, 12 Fed. Reg. 4331, contains similar provisions. §§ 2 (a), 4 (a). Provisions of this statute and regulation, not here material, allow adjustment of maximum rentals when necessary to correct inequities and permit a 15% increase if negotiated between landlord and tenant and incorporated in a lease of a designated term.

[2] Section 206 (a) makes it unlawful "to offer, solicit, demand, accept, or receive any rent for the use or occupancy of any controlled housing accommodations in excess of the maximum rent prescribed under section 204." Section 206 (b) authorized the Housing Expediter to apply to any federal, state, or territorial court of competent jurisdiction for an order enjoining "any act or practice which constitutes or will constitute a violation of subsection (a) of this section."

[3] Proclamation 2714, 12 Fed. Reg. 1. That proclamation recognized that "a state of war still exists." On July 25, 1947, on approving S. J. Res. 123 terminating certain war statutes, the President issued a statement in which he declared that "The emergencies declared by the President on September 8, 1939, and May 27, 1941, and the state of war continue to exist, however, and it is not possible at this time to provide for terminating all war and emergency powers."

so intend, said the District Court, follows from the provision that the Housing Expediter can end controls in any area without regard to the official termination of the war,[4] and from the fact that the preceding federal rent control laws (which were concededly exercises of the war power) were neither amended nor extended. The District Court expressed the further view that rent control is not within the war power because "the emergency created by housing shortage came into existence long before the war." It held that the Act "lacks in uniformity of application and distinctly constitutes a delegation of legislative power not within the grant of Congress" because of the authorization to the Housing Expediter to lift controls in any area before the Act's expiration. It also held that the Act in effect provides "low rentals for certain groups without taking the property or compensating the owner in any way." See 74 F. Supp. 546.

We conclude, in the first place, that the war power sustains this legislation. The Court said in *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 161, that the war power includes the power "to remedy the evils which have arisen from its rise and progress" and continues for the duration of that emergency. Whatever may be the consequences when war is officially terminated,[5] the war power does not necessarily end with the cessation of hostilities. We recently held that it is adequate to support the preservation of rights created by wartime legislation, *Fleming* v. *Mohawk Wrecking &*

---

[4] Section 204 (c) provides: "The Housing Expediter is hereby authorized and directed to remove any or all maximum rents before this title ceases to be in effect, in any defense-rental area, if in his judgment the need for continuing maximum rents in such area no longer exists due to sufficient construction of new housing accommodations or when the demand for rental housing accommodations has been otherwise reasonably met."

[5] See *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, 57.

*Lumber Co.,* 331 U. S. 111. But it has a broader sweep. In *Hamilton* v. *Kentucky Distilleries Co., supra,* and *Ruppert* v. *Caffey,* 251 U. S. 264, prohibition laws which were enacted after the Armistice in World War I were sustained as exercises of the war power because they conserved manpower and increased efficiency of production in the critical days during the period of demobilization, and helped to husband the supply of grains and cereals depleted by the war effort. Those cases followed the reasoning of *Stewart* v. *Kahn,* 11 Wall. 493, which held that Congress had the power to toll the statute of limitations of the States during the period when the process of their courts was not available to litigants due to the conditions obtaining in the Civil War.

The constitutional validity of the present legislation follows *a fortiori* from those cases. The legislative history of the present Act makes abundantly clear that there has not yet been eliminated the deficit in housing which in considerable measure was caused by the heavy demobilization of veterans and by the cessation or reduction in residential construction during the period of hostilities due to the allocation of building materials to military projects.[6] Since the war

---

[6] See H. R. Rep. No. 317, 80th Cong., 1st Sess., pp. 1, 2, 3, 10–11.

The Report states, p. 2:

"There are several factors, in addition to the normal increase in population, which have contributed to the existing housing shortage. These include demobilization of a large number of veterans, shifts in population, less intensive use of housing accommodations, amount of new housing construction, trend away from construction of rental units, and change from tenant to owner occupancy."

As to the effect of demobilization of veterans the Report states, p. 2:

"Heavy demobilization of members of our armed forces, particularly in late 1945 and the first half of 1946, made effective an important demand for housing accommodations. In 1945 an estimated 6,279,000 veterans of World War II were returned to civilian life,

effort contributed heavily to that deficit, Congress has the power even after the cessation of hostilities to act to control the forces that a short supply of the needed article created. If that were not true, the Necessary and Proper Clause, Art. I, § 8, cl. 18, would be drastically limited in its application to the several war powers. The Court has declined to follow that course in the past. *Hamilton* v. *Kentucky Distilleries Co., supra,* pp. 155, 156; *Ruppert* v. *Caffey, supra,* pp. 299, 300. We decline to take it today. The result would be paralyzing. It would render Congress powerless to remedy conditions the creation of which necessarily followed from the mobilization of men and materials for successful prosecution of the war. So to read the Constitution would be to make it self-defeating.

We recognize the force of the argument that the effects of war under modern conditions may be felt in the econ-

in 1946 the number so returned was 5,659,000, and in 1947 to February 28 an additional 212,000 veterans were demobilized. Statistics are not available as to the number of new family units created by returning veterans but undoubtedly the figure is substantial and in many cases creation of new family units was delayed until these veterans were returned to civilian life. The importance and delayed impact of the 11,938,000 veterans returned to civilian life in 1945 and 1946 on an already acute housing shortage is readily apparent."

The effect of the war upon the construction of new dwelling units is shown by the following table:

*Total non-farm dwelling units constructed*

| | | | |
|---|---|---|---|
| 1937 | 336,000 | 1943 | 350,000 |
| 1938 | 406,000 | 1944 | 169,000 |
| 1939 | 515,000 | 1945 | 247,000 |
| 1940 | 603,000 | 1946 | 776,200 |
| 1941 | 715,000 | 1947 (11 months) | 799,000 |
| 1942 | 497,000 | | |

The figures for the years 1937–1945 inclusive are taken from H. R. Rep. No. 317, *supra,* p. 3. Those for 1946 and 1947 are taken from U. S. Bureau of Labor Statistics, Construction, Dec. 1947, p. 4.

omy for years and years, and that if the war power can be used in days of peace to treat all the wounds which war inflicts on our society, it may not only swallow up all other powers of Congress but largely obliterate the Ninth and the Tenth Amendments as well. There are no such implications in today's decision. We deal here with the consequences of a housing deficit greatly intensified during the period of hostilities by the war effort. Any power, of course, can be abused. But we cannot assume that Congress is not alert to its constitutional responsibilities. And the question whether the war power has been properly employed in cases such as this is open to judicial inquiry. *Hamilton* v. *Kentucky Distilleries Co., supra; Ruppert* v. *Caffey, supra.*

The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise. Here it is plain from the legislative history that Congress was invoking its war power to cope with a current condition of which the war was a direct and immediate cause.[7] Its judgment on that score is entitled to the respect granted like legislation enacted pursuant to the police power. See *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170; *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543.

Under the present Act the Housing Expediter is authorized to remove the rent controls in any defense-rental area if in his judgment the need no longer exists by reason of new construction or satisfaction of demand in other ways.[8] The powers thus delegated are far less extensive than those sustained in *Bowles* v. *Willingham, supra,* pp. 512–515. Nor is there here a grant of unbridled administra-

---

[7] See H. R. Rep. No. 317, *supra,* note 6, and statement of Representative Wolcott, Chairman of the House Committee on Banking and Currency which reported the rent bill, 93 Cong. Rec. 4395.

[8] See note 4, *supra.*

tive discretion. The standards prescribed pass muster under our decisions. See *Bowles* v. *Willingham, supra,* pp. 514–516, and cases cited.

Objection is made that the Act by its exemption of certain classes of housing accommodations [9] violates the Fifth Amendment. A similar argument was rejected under the Fourteenth Amendment when New York made like exemptions under the rent-control statute which was here for review in *Marcus Brown Co.* v. *Feldman, supra,* pp. 195, 198–199. Certainly Congress is not under greater limitations. It need not control all rents or none. It can select those areas or those classes of property where the need seems the greatest. See *Barclay & Co.* v. *Edwards,* 267 U. S. 442, 450. This alone is adequate answer to the objection, equally applicable to the original Act sustained in *Bowles* v. *Willingham, supra,* that the present Act lacks uniformity in application.

---

[9] Sec. 202 (c) provides: "The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include—(1) those housing accommodations, in any establishment which is commonly known as a hotel in the community in which it is located, which are occupied by persons who are provided customary hotel services such as maid service, furnishing and laundering of linen, telephone and secretarial or desk service, use and upkeep of furniture and fixtures, and bellboy service; or (2) any motor court, or any part thereof; or any tourist home serving transient guests exclusively, or any part thereof; or (3) any housing accommodations (A) the construction of which was completed on or after February 1, 1947, or which are additional housing accommodations created by conversion on or after February 1, 1947, except that contracts for the rental of housing accommodations to veterans of World War II and their immediate families, the construction of which was assisted by allocations or priorities under Public Law 388, Seventy-ninth Congress, approved May 22, 1946, shall remain in full force and effect, or (B) which at no time during the period February 1, 1945, to January 31, 1947, both dates inclusive, were rented (other than to members of the immediate family of the occupant) as housing accommodations."

The fact that the property regulated suffers a decrease in value is no more fatal to the exercise of the war power (*Bowles* v. *Willingham, supra,* pp. 517, 518) than it is where the police power is invoked to the same end. See *Block* v. *Hirsh, supra.*

*Reversed.*

MR. JUSTICE FRANKFURTER concurs in this opinion because it decides no more than was decided in *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, and *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, and merely applies those decisions to the situation now before the Court.

MR. JUSTICE JACKSON, concurring.

I agree with the result in this case, but the arguments that have been addressed to us lead me to utter more explicit misgivings about war powers than the Court has done. The Government asserts no constitutional basis for this legislation other than this vague, undefined and undefinable "war power."

No one will question that this power is the most dangerous one to free government in the whole catalogue of powers. It usually is invoked in haste and excitement when calm legislative consideration of constitutional limitation is difficult. It is executed in a time of patriotic fervor that makes moderation unpopular. And, worst of all, it is interpreted by judges under the influence of the same passions and pressures. Always, as in this case, the Government urges hasty decision to forestall some emergency or serve some purpose and pleads that paralysis will result if its claims to power are denied or their confirmation delayed.

Particularly when the war power is invoked to do things to the liberties of people, or to their property or economy that only indirectly affect conduct of the war and do not

relate to the management of the war itself, the constitutional basis should be scrutinized with care.

I think we can hardly deny that the war power is as valid a ground for federal rent control now as it has been at any time. We still are technically in a state of war. I would not be willing to hold that war powers may be indefinitely prolonged merely by keeping legally alive a state of war that had in fact ended. I cannot accept the argument that war powers last as long as the effects and consequences of war, for if so they are permanent—as permanent as the war debts. But I find no reason to conclude that we could find fairly that the present state of war is merely technical. We have armies abroad exercising our war power and have made no peace terms with our allies, not to mention our principal enemies. I think the conclusion that the war power has been applicable during the lifetime of this legislation is unavoidable.