[Civ. No. 15515.   First Dist., Div. One.   Apr. 17, 1953.]

JOHN W. LYNCH et al., Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

Dion R. Holm, City Attorney, and Donald J. Kropp, Deputy City Attorney, for Appellants.

Francis McCarty and Jack E. Speckman for Respondents.

BRAY, J.—Petitioners brought an action for injunction, writ of mandate, and declaratory relief.   From a judgment in petitioners' favor defendants appeal.

### QUESTION PRESENTED

Has the "proclamation of peace or the termination of the emergency" referred to in San Francisco's charter occurred?

### FACTS

They are undisputed.   Both petitioners were and are civil service employees of the City and County of San Francisco (hereafter referred to as "City").   Petitioner Lynch was

on military leave pursuant to charter provisions from February 6, 1943, to November 1, 1945, petitioner Mineck from October 3, 1942, to January 16, 1946. Both petitioners are on preferred promotional eligibility lists because of preference due to their military service, provided, in Lynch's case by charter section 146.1, and in Mineck's case by section 153. On September 8, 1939, the President declared a *limited* national emergency in connection with the enforcement of neutrality. May 27, 1941, he declared an *unlimited* national emergency. Section 146.1 provides for a substitute promotional examination for persons returning from military service and that "Such employees shall be eligible for appointment from such list of eligibles in accordance with civil service rules to any vacancy thereafter occurring . . . for a period of four years *after the proclamation of peace or the termination of the emergency,* and before eligibles procuring standing through examinations held subsequent to the original promotional examination." ·(Emphasis added.)

Section 153 provides, among other things, that "Persons serving in the armed forces of the United States or the State· of California during time of war or during any emergency lawfully declared by the President of the United States, who have standing on an eligible list, shall retain their place thereon, and . . . shall be preferred for appointment for a period of four (4) years *after the proclamation of peace or the termination of said emergency. . . .*" (Emphasis added.)

December 31, 1946, the President of the United States issued a Declaration of Cessation of Hostilities of World War II in which he referred to the unconditional surrender of our enemies and stated, ". . . great gains have been made in translating military victories into permanent peace. Although a state of war still exists, it is at this time possible to declare, and I find it in the public interest to declare, that hostilities have terminated. Now, therefore, I, Harry S. Truman, President of the United States of America, do hereby proclaim the cessation of hostilities of World War II. . . ."

On February 20, 1950, the Civil Service Commission sent letters to petitioners to the effect that their preferential eligibility rights could only be retained for four years from December 31, 1946, terminating on December 31, 1950. Thus defendants took the position, and take it here, that the President's Declaration of Cessation of Hostilities constituted the "proclamation of peace or the termination of the emergency" mentioned in both sections 146.1 and 153. The trial court

in its judgment declared that the President's decree did not constitute either a proclamation of peace or a termination of the emergency, enjoined defendants from removing petitioners from the eligible lists and commanded defendants to retain petitioners thereon until the contingency specified in the said charter sections occurs.

### Effect of the President's Decree

Obviously, whether considered in a technical or popular sense, it did not proclaim a peace. It stated that "great gains" had been made towards permanent peace, but it did not state that peace had arrived. It then stated, "Although a state of war still exists . . ." That is not reconcilable with a proclamation of peace. The term "proclamation of peace" is clear, unambiguous and even in the popular sense refers to a historical and clearly understood method of terminating war. Nor was it a declaration of termination of the emergency. Even though hostilities had ceased the emergency still continued, both in fact and in law. ■ This court can take judicial notice of the fact that the President and other administrative officers are still exercising powers given them merely for the emergency.

Defendants' main contention is that in adopting the charter sections the people meant something other than what the language seems to mean, that the people used the words "proclamation of peace" and "termination of the emergency" in the sense of an ending of the fighting, the same sense in which expressions like "termination of said war" and "in time of war" have been held to mean the termination of the fighting or the time of the fighting. Thus in *Burger* v. *Employees' Retirement System,* 101 Cal.App.2d 700 [226 P.2d 38], it was held that the words "termination of said war" in a section of the charter making inoperative during that period provisions reducing certain pensions by sums otherwise earned, meant in a popular sense the cessation of hostilities. "But many decisions recognize that in a popular sense a war is terminated with the surrender or capitulation of the enemy and that in that sense the termination of all hostilities is the termination of the war." (P. 702, citing many cases.) Again, in *Kaiser* v. *Hopkins,* 6 Cal. 2d 537 [58 P.2d 1278], article XIII, section 1¼ of the California Constitution was construed. It provided a certain exemption from taxation of property of residents who had served in the armed forces "in time of war." In denying

such exemption to a soldier who enlisted and served after the Armistice of 1918 and before the declaration of peace, the court held that the words were used in their popular sense, meaning when all the war activities ceased never to be renewed.

But in our case the people used alternatives, one, "proclamation of peace" which has a more narrow meaning than "termination or time of war" and two, "termination of said emergency" which has a broader meaning than "termination or time of war." It is significant, too, that the people in protecting employees from loss of promotion due to their service in the armed forces, used different language than when dealing with the right of persons working during the war to receive their pensions without deduction. In the latter case the advisability for preferential treatment in order to encourage the pensioners to engage in war work would normally end when the hostilities ended, but the end of hostilities would not end the emergency which would keep employees in the armed forces possibly as long as the emergency existed. It is reasonable to assume that the people might have had in mind the great delay that ensued in the first World War between the cessation of hostilities and the declaration of peace and that they intended as long as the emergency existed prior to such declaration, the eligibility should continue. The part of section 153 with which we are concerned was added after the entry of the United States into World War II. Section 146.1 was first adopted in 1947. (It was voted by the people in 1946 prior to the President's declaration.) The fact that the war was then on would indicate that the people in using the alternative meant something different than cessation of hostilities.

On questions dealing with various phrases concerning termination of war there has been some conflict in the authorities. In the Burger case, *supra,* nine cases are cited holding that the popular meaning is cessation of hostilities. Three are New York cases. In a later New York case, *Malbone Garage, Inc.* v. *Minkin,* 272 App.Div. 109 [72 N.Y.S.2d 327], affirmed 297 N.Y. 677 [76 N.E.2d 331], it was held that "duration of war" in a lease covered the period after termination of hostilities until a formal proclamation of peace. In *Commercial Cable Co.* v. *Burleson,* 255 F. 99, Judge Learned Hand held that the President's power to seize private utilities during the continuance of the war did not end with the 1918 Armistice as our armed forces were still in

occupation of enemy territory and in European and Asiatic Russia. In *United States ex rel. Knauff* v. *Shaughnessy* (1950), 338 U.S. 537 [70 S.Ct. 309, 94 L.Ed. 317] the court was considering the application of the War Brides' Act which is effective only ''When the United States is at war or during the existence of the national emergency proclaimed by the President'' in 1941. The court held (p. 546) : ''The special procedure followed in this case was authorized not only during the period of actual hostilities but during the entire war and the national emergency proclaimed May 27, 1941. The national emergency has never been terminated.''

We still have armed forces in enemy territory, some of which territory is still under military occupancy. Other reasons for holding that, in the popular sense of the term, the emergency is not terminated, follow. The President, when he issued his proclamation of cessation of hostilities, stated that his proclamation did not effect the termination of the national emergencies or the state of the war. (Vol. 95, Congressional Record, No. 135, p. 10492.) On February 19, 1947, the President in recommending the repeal of certain statutes enacted by virtue of the emergencies stated, ''I have under continuing study the question of terminating the emergencies proclaimed in 1939 and 1941, and intend to take action as soon as circumstances permit.'' (Vol. 95, Congressional Record No. 135, p. 10492.) On July 27, 1949, the Speaker of the House stated (p. 10492) that the state of war and the national emergencies continued to exist and had been recognized on numerous occasions by both the Congress and the United States Supreme Court. (He referred to *Fleming* v. *Mohawk Wrecking & Lbr. Co.* (1947), 331 U.S. 111 [67 S. Ct. 1129, 91 L.Ed. 1375], and *Woods* v. *Miller Co.* (1948), 333 U.S. 138 [68 S.Ct. 421, 92 L.Ed. 596].) He stated that neither the Congress nor the President ''has taken any step whatever which would have the effect of terminating World War II as such *or* the national emergencies as such.'' (Emphasis added; p. 10492.) On July 27, 1949, the House was determining whether Congress could remain in session after the last day of July in view of a provision of the reorganization bill to the effect that ''Except in time of war or in a national emergency'' it could not do so. An opinion was obtained from the American Law Section of the Legislative Reference Service of the Library of Congress. The opinion concluded (Vol. 95, Congressional Record, Appendix, A5051) that the United States was still technically in a state of war

"and furthermore the terminations of the limited and the unlimited emergencies have not been proclaimed." (P. A5052.) As neither in a technical nor a popular sense has there been a proclamation of peace or a termination of the emergency, the judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 11, 1953.