STUYVESANT TOWN, INC., A NEW JERSEY CORPORATION, PETITIONER, v. CHESTER K. LIGHAM, STATE RENT CONTROL DIRECTOR, RESPONDENT.

Argued January 24, 1955—Decided February 14, 1955.

*Mr. Joseph A. Weisman* argued the cause for the petitioner (*Messrs. Weisman & Freedman,* attorneys).

*Mr. Harold Kolovsky,* Assistant Attorney-General, argued the cause for the respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. Anthony Zoppi,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

BURLING, J. This is a proceeding on petition for declaratory judgment comparable to the matter of *Brookchester, Inc., Section I, v. Ligham,* 17 *N. J.* 460. The declaratory relief sought by the petitioner herein, Stuyvesant Town, Inc.,

a New Jersey corporation, and resisted by Chester K. Ligham, Director of the Office of Rent Control of the State of New Jersey (hereinafter referred to as the State Director), parallels that sought by the petitioners in the *Brookchester, Inc.,* case, *supra,* and the salient features herein are for purposes of disposition of this matter identical thereto. The petition in the present case was filed in the Superior Court, Appellate Division, in lieu of prerogative writ, under *R. R.* 4:88–10, and was certified prior to hearing there on our own motion.

The present matter involves questions disposed of by us in the *Brookchester, Inc.,* case, *supra.* However, an additional question is presented in the present matter, concerning an alleged conflict between the police power of the State (as exerted in the State Rent Control Act of 1953, *L.* 1953, *c.* 216, *N. J. S.* 2A:42–14 *et seq.,* no question relating to the amendments thereto effected by *L.* 1954, *c.* 260, effective December 22, 1954, being advanced herein) and provisions of the National Housing Act, namely *Title* VI, *sec.* 608, of the *Act of* June 27, 1934, *c.* 847, as added May 26, 1942, *c.* 319, *sec.* 11, 56 *Stat.* 303, and the amendments and supplements thereto (see 12 *U. S. C. A., sec.* 1743). This is a question of importance and of general public significance and deserves consideration even though in respect to other matters the facts in this case should present a case exactly parallel to that just decided and would call for a like decision; because if the State has no right of control in the matter the declaration of invalidity of the State Director's orders insofar as they subject the petitioner's property to state rent control should not be qualified but should be absolute.

The pleadings and affidavits on file in this case show that the following are the uncontradicted facts.

Stuyvesant Town, Inc., the petitioner herein, was incorporated in 1946 under and by virtue of the statutes of this State, commonly known as the General Corporation Act, *R. S.* 14:1–1 *et seq.,* and the several supplements thereto and acts amendatory thereof. Its purpose was expressly stated in

the certificate of incorporation to be "to create a private corporation to provide housing for rent or sale."

The certificate of incorporation authorized Stuyvesant Town, Inc.

"to apply for and obtain or cause to be obtained from the Federal Housing Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act as amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of Mortgage or Deed of Trust securing the same. So long as any property of this corporation is encumbered by a mortgage or Deed of Trust insured by the Federal Housing Commissioner it shall engage in no business other than the construction and operation of a Rental Housing Project or Projects."

It provided for the issuance of stock, including 100 shares of preferred stock. The certificate of incorporation provided in this respect:

"The preferred stock at any time outstanding may be redeemed by the corporation at par and dividends declared thereon, but unpaid to the date of such redemption, provided, however, that such stock shall be so redeemed, upon, but in no event before, the termination of any contract of mortgage insurance covering any indebtedness of the corporation without obligation upon the Commissioner[1] to issue debentures as a result of such termination. Preferred stock so redeemed shall be retired and cancelled."

---

[1] Note: "Commissioner" obviously related to "Federal Housing Commissioner" as expressed elsewhere in the certificate of incorporation.

---

It also contained the following express terms:

"SIXTH: The corporation shall not without prior approval of the holders of a majority of the shares of preferred stock, given either in writing or by vote at a meeting of the preferred stockholders called for that purpose (a) assign, transfer, dispose of or encumber any real or personal property, including rents, except as specifically permitted by the terms of the mortgage, (b) remodel, reconstruct, demolish or substract from the premises constituting the project and subject to such mortgage, (c) *permit the occupancy of any of the dwelling accommodations of the corporation except at or below the rents fixed by the schedule of rentals provided hereinafter,* (d) consolidate or merge the corporation into or with any other corporation; go into voluntary liquidation; carry into effect any plan of reorgani-

zation of the corporation; redeem or cancel any of its shares of preferred stock, or effect any changes whatsoever in its capital stock; alter or amend the certificate of incorporation or fail to establish and maintain reserves as set forth in this certificate of incorporation.

\* \* \* \* \* \* \* \*

EIGHTH: The following provisions are hereby adopted for the conduct of the affairs of the corporation and in regulation of the powers of the corporation, the directors and stockholders:

(a)(1) *Dwelling accommodations of the corporation shall be rented at a maximum average rental per room per month fixed by the Board of Directors of the corporation and approved by the holders of the preferred stock.* A schedule of rentals for the reasonable rental value of each apartment based upon the average as so determined shall be filed with the holders of the preferred stock, prior to leasing or offering for lease of any of the dwelling accommodations of the project, and when approved by them, shall thereafter be maintained except as provided in Article Sixth hereof. Store accommodations shall be rented at a rental to be fixed by the Directors with the approval of the holders of the preferred stock. (2) *The corporation shall have the right to charge to and receive from any tenant such amounts as from time to time may be mutually agreed upon between tenant and the corporation with the written approval of the holders of a majority of the shares of preferred stock,* for any facilities and/or services which may be furnished by the corporation to such tenant upon his request, over and above the facilities and services to which such tenant may be entitled by virtue of his lease, including, among other things, telephone operator and switchboard services, electric current, gas, air cooling and conditioning and other additional or extraordinary facilities or services which may be furnished by the corporation in connection with the operation of such housing facilities.

(b) In the event maximum rents are regulated throughout the United States and its possessions by any agency of the United States Government expressly established for purposes of controlling maximum rents, other than the Federal Housing Commissioner, the regulation and restriction provided for in Article Eighth, paragraph (a) will not be required. Such maximum rental as may be established by such Agency or Agencies of the United States as set forth herein will be accepted by the holders of the preferred stock as an approved rent schedule and upon the expiration of the authority of any such Agency of the United States to regulate and fix maximum rentals, the then existing schedule in force with respect to the project shall be the approved rental schedule within the provisions of Article Eighth, paragraph (a) above and shall not thereafter be changed except upon approval of the holders of the preferred stock." (Emphasis supplied.)

The affidavits filed demonstrate that these provisions of the corporate charter were required by the Federal Housing

Commissioner to qualify the petitioner as an applicant for mortgage insurance under *section* 608 of the National Housing Act, *ante*.

The affidavits show without contradiction that the petitioner acquired mortgage insurance from the Federal Housing Administration and constructed its rental housing accommodations (completing the project late in 1947) in accordance with its charter and the regulations promulgated by the Federal Housing Commissioner; and that maximum rent schedules applicable to this project have been approved by the preferred stockholder, *i. e.*, by the Federal Housing Commissioner. The petition asserts, and the answer filed by the State Director admits, that *section* 608 of the National Housing Act, *ante,* expired in 1950, but the controls and restrictions imposed thereby upon projects covered by insured mortgages remain in effect until the mortgages insured thereunder have been fully paid and satisfied.

The State Director further admitted in his answer herein that the original rules and regulations adopted by him "excepted from the operation of the Act [*i. e.*, the State Rent Control Act of 1953, *ante*] certain classes of rental property, one of which classes included the rental property of the petitioner."

Subsequently the State Director adopted rules and regulations referred to as Change No. 5 and Change No. 7, the pertinent provisions of which are set forth in our opinion in the *Brookchester, Inc.,* case, *supra,* and are also included in the pleadings and affidavits on file in this case. The effect of these rules and regulations was to subject the petitioner's rental property to state rent control.

The questions involved in this matter, raised by the petition for declaratory judgment and answer thereto, include the question whether the State Rent Control Act of 1953 is "constitutional." In respect to this general issue of constitutionality the petitioner asserted that the statute impaired the obligation of its contracts, and that the statute constituted an unlawful delegation of power to the State Director

and to municipalities within the State without establishing reasonable classification or standards; it did not brief its arguments in the premises but relied on cases before this court which, it said, "have been fully briefed and have been set down for argument"—in this respect the constitutional questions suggested by the petitioner have been decided adversely to it in our decisions in the *Brookchester, Inc.,* case, *supra,* and in *Jamouneau v. Harner,* 16 *N. J.* 500 (1954). The questions involved also included the questions (a) whether rental housing projects subject to maximum rent approval by the Federal Housing Commissioner under *section* 608 of the National Housing Act, *ante,* are *per se* exempt from regulation and control by the State Rent Director by virtue of the terms of the State Rent Control Act of 1953, *ante;* and (b) whether the State Director's order designated as Change No. 5, with its corollary, Change No. 7, is unreasonable, arbitrary and capricious. These latter questions are disposed of by our determination and declarations in the *Brookchester, Inc.,* case, *supra.*

The further question involved, which requires individual consideration herein, is whether exercise of state rent control by the State Director over housing accommodations subject to maximum rent regulations made by the Federal Housing Commissioner is in conflict with federal law and therefore unconstitutional or ineffective under the supremacy clause of the United States Constitution. *U. S. Const., Art.* VI, *par. 2.*

The rental housing project involved in this case is of the category commonly known as a "608" by virtue of the financing arranged under *section* 608 of the National Housing Act, *ante.* The Federal Housing Commissioner was empowered to make rules and regulations to effectuate the provisions of the National Housing Act, *ante,* and applied, within the apparent authority of *sec.* 608, *subpar.* (f) (12 *U. S. C. A., sec.* 1743(f)) as amended, the provisions of *Title* II, *sec.* 207, of the National Housing Act, as amended (12 *U. S. C. A., sec.* 1713) to authorize the corporate charter

restrictions imposed on Stuyvesant Town, Inc. *Cf. Brook-chester, Inc., Section I,* v. *Ligham, supra.*

Some private corporations formed under specific state enactments subjecting them to forms of state rent control were expressly declared to be eligible for mortgage insurance issued by the Federal Housing Administration under *section* 207 of the National Housing Act, *ante.* See 12 *U. S. C. A., sec.* 1713(*b*)(1). General corporations were made eligible for Federal Housing Administration mortgage insurance under 12 *U. S. C. A., sec.* 1713(*b*)(2). Since 1941 this latter provision of the National Housing Act, *ante,* has provided for insurance of mortgages of such corporations as "until the termination of all obligations of the Administrator [*i. e.,* Commissioner] under such insurance, are regulated or restricted by the Administrator [*i. e.,* Commissioner] as to rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment. \* \* \*" 12 *U. S. C. A., sec.* 1713(*b*), has been amended by addition of the following express declaration (Act of April 20, 1950, *sec.* 106, 64 *Stat.* 53):

"The insurance of mortgages under this section is intended to facilitate particularly the production of rental accommodations, at reasonable rents, of design and size suitable for family living. The Commissioner is, therefore, authorized and directed in the administration of this section to take action, by regulation or otherwise, which will direct the benefits of mortgage insurance hereunder primarily to those projects which make adequate provision for families with children, and in which every effort has been made to achieve moderate rental charges."

There exists in the provisions of the National Housing Act, as amended, hereinbefore discussed, an obvious intent by Congress to achieve at least indirectly reasonable rent stabilization on "608" projects to provide *both* moderate rentals and reasonable financial return to the investor. 12 *U. S. C. A., sec.* 1713(*b*), *supra,* in effect authorized the

federal instrumentality to issue insurance of a private corporation's obligation conditioned on *voluntarily accepted federal control* of the corporation's rents except where expressly provided (12 *U. S. C. A., sec.* 1713(*b*)(1), *supra*) that state control shall govern rentals. The present plaintiff is not in the category covered by this express state control provision (12 *U. S. C. A., sec.* 1713(*b*)(1), *supra*) of the National Housing Act, *ante.*

The question involved remaining for detailed discussion in this case reduces itself to the query whether state rent control interferes with the purposes and intent of Congress in the enactment of the National Housing Act, *supra.*

*In limine* it appears that the National Housing Act, *ante,* did not provide federal rent control under the national police power, or any other similar federal power, such as the war power, but authorized the Federal Housing Commissioner to extend mortgage insurance to corporations which voluntarily *agreed* to submit to rental control by him, or which made "every effort * * * to achieve moderate rental charges." Significantly, no authority for the Federal Housing Commissioner to set minimum rentals is expressed in the Act of Congress, nor is there any such effort disclosed in the regulations promulgated by him. These regulations and the provisions of the certificate of incorporation of the petitioner adopting them contain *no* minimum rental proviso. Not only is there an absence of a minimum rental provision, but the regulations and the charter of the corporation expressly authorize the corporation to charge rentals at *less* than the maximum fixed by the Federal Housing Commissioner as preferred stockholder of the private corporation. Seemingly, therefore, there is no conflict between the federal power and a state regulation requiring rentals to be maintained at a level less than the maximum permissible under the federal order.

The Congressional intent may be indicated by reference to other enactments in the field of rental controls.

482

The Veterans' Emergency Housing Act, the *Act of* May 22, 1946, *c.* 268, 60 *Stat.* 207, 50 *App. U. S. C. A., sec.* 1821 *et seq.*, amended sections of the National Housing Act, *ante*, including *section* 608, in various particulars, authorizing the Federal Housing Commissioner to secure preferences or priorities to veterans (see 50 *App. U. S. C. A., sec.* 1830). These provisions do not establish rent control on rental housing constructed under the National Housing Act, as amended, *ante*.

By the Housing and Rent Acts (Acts of June 30, 1947, *c.* 163, 61 *Stat.* 193; March 30, 1948, *c.* 161, 62 *Stat.* 93; March 30, 1949, *c.* 42, 63 *Stat.* 18; June 23, 1950, *c.* 354, 64 *Stat.* 255; June 30, 1952, *c.* 530, *Title* II, *sec.* 201(*a*), 66 *Stat.* 306; April 30, 1953, *c.* 31, *sec.* 2, 67 *Stat.* 24) other amendments were effected (see 50 *App. U. S. C. A., sec.* 1881 *et seq.*). Partial repeal of the Veterans' Emergency Housing Act, *supra*, was declared (*sec.* 1881). Title VI of the National Housing Act, *ante* (12 *U. S. C. A., sec.* 1736–1743) was amended by adding *section* 609, expressly stating therein the purpose "to promote the production of housing for veterans  \*  \*  \*  at moderate prices or rentals within their reasonable ability to pay, through the application of modern industrial processes" by authorizing the Commissioner to insure additional categories of loans (50 *App. U. S. C. A., sec.* 1883; also 12 *U. S. C. A., sec.* 1744). Rent control of a sort was applied: for example, rental housing accommodations completed after June 30, 1947 could not be offered to any person, for at least seven days, at any price lower than that at which the rental unit was last offered to a veteran, 50 *App. U. S. C. A., sec.* 1884(*a*)(4), but it was provided that this section should cease to be in effect not later than April 30, 1954, 50 *App. U. S. C. A., sec.* 1884(*e*). In its declaration of policy, 50 *App. U. S. C. A., sec:* 1891, the Congress declared:

"\*  \*  \*  it is its purpose to terminate at the earliest practicable date all Federal restrictions on rents on housing accommodations. \*  \*  \*"

The Congress also, in the same section, declared an existing emergency in "defense-rental areas." *Ibid.* The Housing and Rent Acts, *ante,* excepted from control housing accommodations completed after February 1, 1947 and defined defense-rental areas. 50 *App. U. S. C. A., sec.* 1892. It was also provided that where a state specifically "expressed its intent that State rent control shall be in lieu of Federal rent control, with respect to housing accommodations within defense-rental areas in such State," federal rent controls under these acts should be terminated. 50 *App. U. S. C. A., sec.* 1894(*j*)(1) and (2). All federal controls, even in defense rental areas, were to cease not later than April 30, 1954. 50 *App. U. S. C. A., sec.* 1894(*f*)(5).

██ These enactments, the Veterans' Emergency Housing Act and the Housing and Rent Acts, *ante,* were enacted by the Congress as emergency measures in exercise of the war power, *Woods v. Cloyd W. Miller Co.,* 333 *U. S.* 138, 144–146, 68 *S. Ct.* 421, 92 *L. Ed.* 596, 602–603 (1948), and have spent their force by their own terms. Nevertheless, it is significant that Congress did not exercise independently its peacetime police powers. Rights of property may not be interfered with except by a valid exercise of police power or the war power, or by giving just compensation. In control of rentals the necessity arising by emergency is subject to judicial inquiry. *Jamouneau v. Harner, supra* (16 *N. J.,* at *pages* 515–516).

█ The insurance and guarantees contained in and provided for by the National Housing Act, *ante,* have been declared to be within the constitutional grants of power to Congress to appropriate for the general welfare and to borrow money on the credit of the United States. 38 *Op. Atty. Gen.* 258 (1935). Its purpose has been said to be to stimulate the financing and erection of housing in great quantities and in areas where industries were located. *Boosman v. United Bldg. Co.,* 109 *Cal. App. 2d* 486, 241 *P. 2d* 58, 61–62 (*Cal. Dist. Ct. App.* 1952). *Cf. Levin v. Stratford Plaza,* 196 *Md.* 293, 76 *A. 2d* 558, 561 (*Md. Ct.*

*App.*, 1950). The original "plain objective" of the National Housing Act, *ante*, was "to stimulate the building trades and to increase employment." *United States v. Emory*, 314 *U. S.* 423, 430, 62 *S. Ct.* 317, 86 *L. Ed.* 315, 323 (1941).

These purposes of the National Housing Act, *ante*, even coupled as they are with indirect maximum rent control (through voluntary agreement) by the Federal Housing Commissioner acting as preferred stockholder of the private corporation, are insufficient to oust the State's police power from the field of rental housing.

In an example of this juridical concept, *Thomson v. Union Pacific Railroad Company*, 9 *Wall.* 579, 76 *U. S.* 579, 19 *L. Ed.* 792 (1870), the Union Pacific Railway Company (Eastern Division), a corporation created by the Legislature of Kansas, received government aid in bonds and land, and, thus aided, constructed its road to become one link in the transcontinental line known as the Union Pacific system. The Kansas legislature enacted a law laying taxes on the corporation's property and a bill was filed to restrain collection thereof, on the ground that the property of the company was mortgaged to the United States, and that it, under the Congressional grant, was bound to perform certain duties and ultimately pay five per cent. of its net earnings to the United States, an obligation which would be greatly hindered if the taxes imposed should be collected. The railroad's contention was not sustained, the United States Supreme Court holding that there was no exemption from state jurisdiction in the absence of express legislation to that effect. *Cf. Central Pacific R. Co. v. People of State of California*, 162 *U. S.* 91, 16 *S. Ct.* 766, 40 *L. Ed.* 903 (1896).

Also pertinent to the philosophy that State's rights are not automatically ousted is *Union Pacific R. Co. v. Peniston*, 18 *Wall.* 5, 85 *U. S.* 5, 36, 21 *L. Ed.* 787, 793 (1873), in which case the situation was a parallel to that of the *Thomson* case, *supra*, except that the railroad corporation involved was created by an Act of Congress. It was held that a state tax levied on real and personal property of this company

was not interference with any power of the general government and was not prohibited by the Federal Constitution.

In *Reagan v. Mercantile Trust Co.*, 154 *U. S.* 413, 14 *S. Ct.* 1060, 38 *L. Ed.* 1028 (1894), another pertinent example of this philosophy, the Texas & Pacific Railway was a corporation organized under the laws of the United States (16 *Stat.*, at *L.* 573). It built its line through the State of Texas and Texas subjected it to intrastate rate control. The United States Supreme Court held (154 *U. S.*, at *page* 416, 14 *S. Ct.*, at *page* 1061, 38 *L. Ed.*, at *page* 1030) :

"\* \* \* conceding to Congress the power to remove the corporation, in all its operations, from the control of the state, there is in the act creating this company nothing which indicates an intent on the part of congress so to remove it, and there is nothing in the enforcement by the state of reasonable rates for transportation wholly within the state which will disable the corporation from discharging all the duties and exercising all the powers conferred by Congress. \* \* \* (Congress) knew that \* \* \* it would be engaged in a business, control of which is nowhere, by the federal constitution, given to congress. It must have known that, in the nature of things, the control of that business would be exercised by the State, and if it deemed that the interests of the nation, and the discharge of the duties required on behalf of the nation from this corporation, demanded exemption in all things from state control, it would unquestionably have expressed such intention in language whose meaning would be clear. Its silence in this respect is satisfactory assurance that, in so far as this corporation should engage in business wholly within the state, it intended that it should be subjected to the ordinary control exercised by the state over such business. \* \* \*"

It has also been held that private corporations (*i. e.*, national banks in the specific instance subjected to judicial review) created under Acts of Congress

"\* \* \* are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the Nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. *It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.* \* \* \*" (Emphasis supplied) *First National Bank of Louisville, Ky. v. Commonwealth of Kentucky*, 9 *Wall.* 353, 76 *U. S.* 353, 19 *L. Ed.* 701, 703 (1870).

In other words, as the United States Supreme Court stated in *Oklahoma Tax Commission v. Texas Co.*, 336 *U. S.* 342, 365, 69 *S. Ct.* 561, 93 *L. Ed.* 721, 739 (1949):

"* * * so far as concerns private persons claiming immunity for their ordinary business operations (even though in connection with governmental activities), no implied constitutional immunity can rest on the merely hypothetical interferences with governmental functions here asserted to sustain exemption. * * * Congress has not created an immunity here by affirmative action, and * * * '* * * if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity.' "

We find in the State Rent Control Act of 1953, *ante*, and in valid rent controls thereunder applied to the petitioner's property, no element incapacitating the corporation from discharging its duties to the Federal Government. The state rent control is compatible with the federal maximum rent levels inasmuch as the corporation is by the federal authority expressly authorized to charge rentals at a level *less* than that maximum and the Congress has enacted no indication that it intended to withdraw the private corporation, created under state law, or its business, from the operation of state legislation of any category. We are not presented here with the question whether the Congress has power under the United States Constitution to so remove the solely intrastate business of a private corporation created under and existing by virtue of the State's laws from the operation of the State's police powers, and we express no views thereon.

## Conclusion

Upon the findings of fact herein and conclusions of law expressed herein, incorporating the conclusions of law expressed in our opinion in *Brookchester, Inc., Section I, v. Ligham*, as applied to the facts in this case, this court will

enter judgment declaring the respective rights of the parties hereto as follows:

(1) The State Rent Control Act of 1953, *N. J. S.* 2A:42-14 *et seq.*, is not rendered ineffective or unconstitutional by reason of alleged conflict with the National Housing Act, and the several amendments and supplements thereto, and is compatible therewith;

(2) The State Rent Control Act of 1953, *N. J. S.* 2A:42-14 *et seq.*, was not an unconstitutional interference with contractual rights between the petitioning landlord and its tenants, nor an unconstitutional delegation of power to the State Rent Control Director or to municipal corporations in this state;

(3) The orders promulgated by the State Director of Rent Control and known respectively as Change No. 5 and Change No. 7, insofar as they purport to subject to control a portion of a class of properties otherwise exempt, by means of a quantitative classification foreign to the State Rent Control Act of 1953, *N. J. S.* 2A:42-14 *et seq.*, constitute arbitrary action in excess of delegated powers by the State Director of Rent Control, and therefore are void and ineffective to that extent, as applied to the rental housing accommodations of the petitioner, and the provisions therein subjecting projects or buildings containing 50 units or more, completed between February 1, 1947 and August 1, 1953, to state rent control are hereby declared void.

HEHER, J. (dissenting in part). The regulation of the rent ceiling for accommodations afforded by housing projects financed by Government-insured mortgages under the National Housing Act, 12 *U. S. C. A., section* 1743, is committed to the Federal Housing Commissioner for a reasonable containment of the rental charges and the amortization of the Government's mortgage security; and there can be no state interference with the fulfillment of what has been made exclusive federal policy.

The federal act, *section* 1743, also 1713(*b*), empowers the Commissioner to regulate and restrict rents, rate of return and methods of operation; and the corporate structure itself is so molded and conditioned. The Government's reserved rent control has the three-fold object of providing reasonably priced tenancies yielding also a fair return to the operator of the housing facility, and the Government's exonerative protection under its insurance undertaking, all to serve an urgent essential public need.

Thus, by preemption, rent control itself becomes to this extent the Government's exclusive province. But such is not the sum of state control under the state act. The state law covers a broader area; and in so far as it does not conflict with the reserved federal control it is effective. For example, the state act confers jurisdiction not only to fix maximum rents, but also of evictions and "manipulative," "speculative," and irregular practices deemed offensive to state control policy without invading the reserved federal domain, limited as it is to the execution of the policy and design of the federal act.

And this is the plain import, I would suggest, of *section* 30 of the state act, *N. J. S.* 2A:42–43, providing that "In the event * * * Federal rent control is in operation in any area of this State and this act is in operation also in such area, the provisions of such Federal rent control shall prevail." And "Federal rent control" is defined, *N. J. S.* 2A:42–14, as "the operation of any Act of Congress and of any rule or regulation promulgated pursuant to the authority of any Act of Congress and the administration of any such act or rule or regulation by any department, authority, agent, officer, or other administrative agency, authority or board of the Government of the United States, in respect to housing space and the rental thereof in effect and operation in the State of New Jersey or in any part or parts thereof." The preamble declares that the "enactment of an adequate State rent control law, to become operative upon the termination of federal rent control, is imperative."

These are not terms of art, but definitive words of ordinary usage that are to be given their common understanding if the legislative purpose is to be effectuated.

It is of interpretive significance that the regulations adopted by the Federal Commissioner provide, and the provision is incorporated in the charter, that such rent control would yield to the regulation of maximum rents by "another agency of the United States Government," whose established maximum rental "will be accepted by the Commissioner as an approved rent schedule," and be resumed upon the expiration of the authority of such agency to fix maximum rentals, when the maximum rental then in force in relation to the project shall continue and "shall not thereafter be changed except upon approval of the Commissioner."

There is no such submission to the regulation of maximum rents by a state authority, for obvious reasons related to overriding federal control requisite to the service of federal policy. The State agency is not empowered to enforce the federal rule of rent control according to federal standards and interests, within the federal rent maximum; and it cannot thus defeat federal control to subserve legitimate national aims in the field.

The nature of the power is revealed by the provision for a continuance of Federal rent control until the termination of "all obligations" of the Commissioner under the granted insurance. The legislative standard, 12 *U. S. C. A., section* 1713, is "reasonable rentals to tenants and a reasonable return on the investment," thereby permitting of the amortization protective of the Government's interest.

The State Director would by Change No. 5 "roll back" the established rental maximum to a time when the maximum was substantially lower than it now is under the order of the Federal Commissioner; and this is beyond his province. Thereby, federal control would be subverted.

I concur in the holding that the exclusion of buildings having less than 50 units from the operation of the order, unrelated as it is to the service of any discernible reason of

legislative policy, renders the classification illusory and discriminatory and devoid of vital force.

I would modify accordingly the judgment declarative of the matters in controversy.

Mr. Justice WACHENFELD joins in this dissent.

*For entry of judgment in accordance with majority opinion*—Chief Justice VANDERBILT, and Justices OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For entry of judgment in accordance with minority opinion*—Justices HEHER and WACHENFELD—2.