Revised October 30, 1998

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

_____

No. 97-50454

_____

FRANCOIS DANIEL LESAGE,

Plaintiff-Appellant,

VERSUS

STATE OF TEXAS; UNIVERSITY OF TEXAS SYSTEM;
BERNARD RAPOPORT; THOMAS O. HICKS; MARTHA SMILEY;
LINNET DEILY; DONALD EVANS; ZAN HOLMES, JR.;
LOWELL LEBERMANN; TOM LOEFFLER; ELLEN CLARKE TEMPLE;
UNIVERSITY OF TEXAS AT AUSTIN; ROBERT BERDAHL;
COLLEGE OF EDUCATION; MANUEL JUSTIZ, Dean of the
College of Education, in his official capacity;
FRANK WICKER, Director of Admissions, in his official
capacity; WILLIAM CUNNINGHAM, Chancellor, Chancellor of
the University of Texas System in his official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

October 13, 1998

Before REAVLEY, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Francois Daniel Lesage applied to enroll in a doctoral program in counseling psychology at The University of Texas at Austin. Midway through the University's process of accepting applicants to that program, our Court handed down its opinion in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir.), *cert. denied*, 518 U.S. 1033, 116 S. Ct. 2581 (1996).

Lesage, an African immigrant of Caucasian descent, was denied admission. He consequently sued the State of Texas, the University and several of its subdivisions, and various University officials in their official capacities. Lesage alleged that the University impermissibly relied on race as a selection criterion by giving preferred status to Black and Hispanic applicants. He claimed that the University's admissions policy violated the Fourteenth Amendment of the United States Constitution and 42 U.S.C. §§ 1981, 1983, and 2000d. He sought monetary, declaratory, and injunctive relief.

The state asserted sovereign immunity for itself, its agencies, and its officials acting in their official capacity under the Eleventh Amendment, and at an early stage in the proceedings the district court dismissed Lesage's claims to the extent that he sought monetary relief under §§ 1981 and 1983. Lesage moved for partial summary judgment on the issue of the state's liability, and the state moved for summary judgment based on its theory that Lesage would have been denied admission regardless of the use of

-2-

racial preferences in admissions.  The district court granted the state's motion and dismissed the case.

Lesage appeals from the adverse judgment, and we reverse.

**I.**

The state asserts that Lesage's claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, are barred by the Eleventh Amendment.[1]  Pursuant to the United States Constitution, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend.

---

[1]  The state has not filed a notice of appeal from the district court's ruling that the state was not immune from Lesage's Title VI claims.  At first blush it might appear that to dismiss the case now on sovereign immunity grounds would violate the rule that an appellate court simply has no authority to grant the state relief that would expand its rights under the judgment.  *See* FED. R. APP. P. 4(a) ("[I]n a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 must be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from . . . ."); *cf. **United States v. Coscarelli***, 149 F.3d 342, 343 (5th Cir. 1998) (en banc). Nevertheless, "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." ***Edelman v. Jordan***, 415 U.S. 651, 678, 94 S. Ct. 1347, 1363 (1974); *see **Texas ex rel. Bd. of Regents of Univ. of Tex. Sys. v. Walker***, 142 F.3d 813, 819 n.7 (5th Cir. 1998), *petition for cert. filed*, 67 U.S.L.W. 3156 (U.S. Aug. 26, 1998) (Nos. 98-348 & 98-350).  It would be anomalous for us to require the state to file a cross-appeal to preserve the immunity issue for appeal when the state had no obligation to raise the issue in the district court in the first place.

-3-

XI. Federal jurisdiction is thus negated with respect to covered suits, including federal suits against a state brought by the citizens of that state. *See* **Idaho v. Coeur d'Alene Tribe**, 521 U.S. 261, ---, 117 S. Ct. 2028, 2033 (1997); **Hans v. Louisiana**, 134 U.S. 1, 10 S. Ct. 504 (1890). Eleventh Amendment immunity, if applicable, is shared by a state's agencies and officers to the extent that the state is the "real, substantial party in interest." **Pennhurst State Sch. & Hosp. v. Halderman**, 465 U.S. 89, 101, 104 S. Ct. 900, 908 (1984); *see* **Regents of the Univ. of Cal. v. Doe**, 519 U.S. 425, ---, 117 S. Ct. 900, 903 (1997); **Earles v. State Bd. of Cert. Pub. Acc'ts**, 139 F.3d 1033, 1036 (5th Cir. 1998), *petition for cert. filed*, 67 U.S.L.W. 3177 (U.S. Sept. 1, 1998) (No. 98-385).

The district court addressed the state's original claims of sovereign immunity with respect to the entire case and granted the state's motion to dismiss to the extent that Lesage sought monetary relief from the state pursuant to 42 U.S.C. §§ 1981 and 1983. The motion was otherwise denied. The entire case was later dismissed with prejudice pursuant to the court's entry of summary judgment in favor of the state.

Lesage may not bring his claims against the state in federal court unless the state has waived its immunity or Congress has abrogated it. Congress has conclusively resolved this issue against the state's claims of immunity by providing that "[a] State

shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964."  42 U.S.C. § 2000d-7(a)(1).

## A.

The state contends that the abrogation of its Eleventh Amendment immunity under 42 U.S.C. § 2000d-7(a)(1) is invalid.  "In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity'; and second, whether Congress has acted 'pursuant to a valid exercise of power.'"  *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55, 116 S. Ct. 1114, 1123 (1996) (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S. Ct. 423, 426 (1985)) (internal citation omitted, alterations in original).  The first element of this inquiry -- "a clear legislative statement," *id.*, of congressional intent to abrogate the states' immunity -- has plainly been satisfied by 42 U.S.C. § 2000d-7(a)(1).

The second element -- federal legislative power to accomplish the abrogation -- is also present.  The Constitution forbids any state law that may "deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  This provision has been construed to mean that in the distribution of

-5-

benefits a state government cannot discriminate among citizens on the basis of race absent a compelling governmental interest in doing so, narrowly tailored to accomplish that need. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113 (1995); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94, 109 S. Ct. 706, 721-22 (1989); *Dallas Fire Fighters Ass'n v. City of Dallas, Tex.*, 150 F.3d 438, 440-41 (5th Cir. 1998); *Messer v. Meno*, 130 F.3d 130, 135-36 (5th Cir. 1997), *petition for cert. filed*, 67 U.S.L.W. 3259 (U.S. Sept. 23, 1998) (No. 98-535); *Hopwood*, 78 F.3d at 940.

Congress has "power to enforce" the substantive provisions of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 5. While this is a broad grant of power, it is not unlimited. *See City of Boerne v. Flores*, 117 S. Ct. 2157, 2163 (1997) (quoting *Oregon v. Mitchell*, 400 U.S. 112, 128, 91 S. Ct. 260, 266 (1970)). Congress only has the power to "enforce." This power is not a power to decree or change the substance of constitutional rights, because if it were Congress could no longer be said to be enforcing the provisions of the Fourteenth Amendment. *See id.* at 2164. The Supreme Court thus recently announced a new standard for testing whether Congress has properly exercised Section Five power: "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.*, 117 S. Ct. at 2164. This Court has paraphrased the command in *Flores*

-6-

to involve consideration of "two primary facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations." *Coolbaugh v. Louisiana ex rel. La. Dep't of Public Safety & Corr.*, 136 F.3d 430, 435 (5th Cir. 1998), *cert. denied on other grounds*, 67 U.S.L.W. 3230 (U.S. Oct. 5, 1998) (No. 97-1941) (petition filed by Coolbaugh on ADA issues); *see also* **Scott v. University of Miss.**, 148 F.3d 493, 501-02 (5th Cir. 1998).

In the case of Title VI, the constitutional concern is racial discrimination in federally funded public institutions. Racial discrimination by state actors invokes the prohibition of the Equal Protection Clause. *See* U.S. CONST. amend. XIV, § 1. The legislation enacted by Congress to enforce that prohibition provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. This law prohibits precisely that which the Constitution prohibits in virtually all possible applications.[2] It can therefore hardly be argued that the

---

[2] The text of the statute apparently does not account for a constitutionally permissible race-based distinction. Strict scrutiny is not "strict in theory, but fatal in fact." **Adarand**, 515 U.S. at 237, 115 S. Ct. at 2117 (citing **United States v. Paradise**, 480 U.S. 149, 107 S. Ct. 1053 (1987), as an example of a case in which a narrowly tailored race-based remedy survived scrutiny).

statute does not reflect "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." That being the case, the original enactment of Title VI, as well as the subsequent explicit abrogation of state sovereign immunity to permit federal enforcement of Title VI, were within the congressional power to enforce the Fourteenth Amendment.

**B.**

The state suggests that Congress intended to invoke its powers under the Spending Clause rather than the Fourteenth Amendment when it enacted Title VI. Assuming arguendo the validity of that proposition concerning the subjective intent of certain legislators, it is entirely irrelevant to our inquiry. In evaluating the constitutionality of a statute, we simply ask if Congress sufficiently articulated an abrogation of state sovereign immunity and if it had the power to do so. *See* ***Seminole Tribe***, 517 U.S. at 55, 116 S. Ct. at 1123. This is an entirely objective inquiry, for "'[t]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.'" ***EEOC v. Wyoming***, 460 U.S. 226, 243 n.18, 103 S. Ct. 1054, 1064 n.18 (1983) (quoting ***Woods v. Miller***, 333 U.S. 138, 144, 68 S. Ct. 421, 424 (1948)) (alteration in original); *see also* ***Ussery v. Louisiana ex rel. La. Dep't of Health & Hosps.***, 150 F.3d 431, 436 n.2 (5th Cir. 1998) ("Given the objective nature of our

judicial review, the State's cursory argument that the statutory text and legislative history of the 1974 Amendments to the EPA support a finding that Congress was acting pursuant to the interstate commerce clause when it made those amendments is immaterial."); *Wheeling & Lake Erie Ry. Co. v. Public Util. Comm'n*, 141 F.3d 88, 92 (3d Cir. 1998) ("[W]hen determining the sources of Congress's authority to legislate, we may look beyond the expressed constitutional basis in a statute's preamble or legislative history."); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997); *Bryant v. New Jersey Dep't of Transp.*, 1 F. Supp. 2d 426, 432-35 (D.N.J. 1998).

Moreover, it is the statute abrogating immunity, not the particular substantive provision of the statute, which specifically concerns us. *See Ussery*, 150 F.3d at 436 n.2; *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 838 n.7 (6th Cir. 1997). Congress unquestionably enacted 42 U.S.C. § 2000d-7 with the "intent" to invoke the Fourteenth Amendment's congressional enforcement power. The purpose of the provision, enacted in 1986, was to legislatively overrule the result in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S. Ct. 3142 (1985). In *Atascadero*, the Court held that Section 504 of the Rehabilitation Act of 1973,[3] which prohibited states from discriminating against the disabled in the

_____

[3] Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (codified as amended at 29 U.S.C. § 794).

administration of federally funded programs, did not contain a sufficiently specific statement of abrogation of Eleventh Amendment immunity to permit suits against states in federal court. *See Atascadero*, 473 U.S. at 245-46, 105 S. Ct. at 3149. Congress instantly recognized the far-reaching implications of this ruling and enacted, as part of the Rehabilitation Act Amendments of 1986,[4] legislation to reverse the result in **Atascadero** and to prevent the application of the reasoning in **Atascadero** to preclude the filing of suits in federal court against states under similar statutes.[5] The *Congressional Record* contains specific references to exercising congressional power under Section Five of the Fourteenth Amendment to accomplish this abrogation of Eleventh Amendment immunity.[6] The

---

[4] Pub. L. No. 99-506, § 1003, 100 Stat. 1807, 1845 (codified at 42 U.S.C. § 2000d-7).

[5] The coverage of the abrogation of Eleventh Amendment immunity includes:

> title IX of the Education Amendments of 1972 [20 U.S.C. § 1681 *et seq*.], the Age Discrimination Act of 1975 [42 U.S.C. § 6101 *et seq*.], title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d *et seq*.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7.

[6] Senator Cranston, self-proclaimed author of § 504 of the Rehabilitation Act and the post-**Atascadero** legislation to abrogate the states' Eleventh Amendment immunity from suit under that provision, spoke on the floor of the Senate concerning the provision that would ultimately be enacted and codified as 42 U.S.C. § 2000d-7. By unanimous consent, an official report on the legislation, written by the Justice Department and relied upon by

state's argument thus rests on presumptions regarding subjective intent which are simply incorrect with respect to the relevant statute.

We thus conclude that the district court correctly ruled when it declined to dismiss Lesage's claims under 42 U.S.C. § 2000d on Eleventh Amendment grounds.

---

Senator Cranston, was entered into the report at Senator Cranston's request.  With respect to congressional authority for the proposed abrogation of Eleventh Amendment immunity, the letter opined that such an action could be taken pursuant to powers under both the Spending Clause and the enforcement clause (§ 5) of the Fourteenth Amendment.  With reference to use of the enforcement power, the letter noted:

> The [*Atascadero*] Court stated that Congress may provide for suits against the States to enforce the fourteenth amendment . . . .
>
> * * *
>
> *. . . Atascadero* provides the blueprint for Congressional action to waive the eleventh amendment's ban to suit in Federal court under the fourteenth amendment . . . .  Thus, to the extent that the proposed amendment is grounded on congressional powers under section five of the fourteenth amendment, S. 1579 makes Congress' intention 'unmistakeably clear in the language of the statute' to subject States to the jurisdiction of Federal courts.

132 CONG. REC. S15100 (daily ed. Oct. 3, 1986) (Letter from John R. Bolton, Assistant Attorney General, U.S. Department of Justice, Office of Legislative and Intergovernmental Affairs, to Hon. Orrin Hatch, Chairman, Committee on Labor and Human Resources, U.S. Senate (July 13, 1986) (citing *Atascadero*, 473 U.S. at 242, 105 S. Ct. at 3147, and *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S. Ct. 2666 (1976))).

## II.

In his motion for partial summary judgment, Lesage relied entirely upon the state's admission that its pre-**Hopwood** admissions process "involved explicit assessments of many candidate attributes, including race." The state responded in its own motion for summary judgment and in its reply to Lesage's motion that race had nothing to do with the decision to exclude Lesage from the counseling psychology program. The state's main two contentions were that Lesage was eliminated from consideration before race was taken into account, and that Lesage would not have been offered admission even if racial preferences had not been employed.

We review a summary judgment de novo. *See, e.g.,* **FDIC v. Shaid**, 142 F.3d 260, 261 (5th Cir. 1998) (per curiam). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The movant is obligated to explain the basis for its motion, identifying evidence in the record which demonstrates the absence of a genuine issue of material fact. *See* **Celotex Corp. v. Catrett**, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). In order to defeat summary judgment, the nonmovant must produce affidavits or other evidence establishing specific facts that show that there is a genuine issue

-12-

for trial.  *See* FED. R. CIV. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).  Drawing all reasonable inferences in favor of the nonmovant, we conduct the same inquiry as would the district court. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

**A.**

The state presented evidence to clarify the admissions procedure for the counseling psychology program in order to support its contention that, although race had been considered during the admissions process, Lesage had been eliminated as a candidate prior to the use of racial preferences.  An affidavit by Dr. Frank Richardson, an associate professor of counseling psychology and the chairman of the University's counseling psychology admissions committee, was attached to the state's response.  In it, Dr. Richardson explained the admissions procedure, as it was conducted for the class entering in the fall of 1996.  Approximately 223 applications were received in January and February 1996.  The first cut, when Lesage's application was eliminated, narrowed the field to forty qualified applicants, from which approximately fifteen to eighteen applicants would be offered admission.  Applicants who did not meet the minimum standards for grade point average or Graduate Record Exam (GRE) score were eliminated at this stage.  Marginal

candidates whose relatively poor academic record or test scores were not counterbalanced by other factors such as the personal statement, difficulty of undergraduate curriculum, strength of recommendations, or extenuating circumstances, were also eliminated. The affidavit conceded that in choosing students from the resulting pool of forty candidates, the committee did consider "the Program's pedagogical need for a diverse entering class," which, to the committee, meant that it would "consider factors such as gender, age, race, and ethnicity in making [a] final decision as to the most desirable composition of the class." Based on this evidence, the state asserted, in its response to Lesage's motion for partial summary judgment, that:

> Whatever consideration is given race and ethnicity in deciding on the ultimate makeup of a counseling psychology class, it played no role in the review of Lesage's application. His application was rejected early on, when the committee was reviewing the large pool and narrowing it down to approximately 40 applicants. Contrary to the two-track system analyzed in *Hopwood*, Lesage's application was "in the mix" with the rest, and was not even remotely competitive. Only later on did the committee add student "diversity" as a decision-making criterion.

In reply, Lesage provided the district court with evidence that race also had been taken into account before the "first cut" to forty students was determined. The evidence was taken from Dr. Richardson's deposition testimony regarding the initial reduction of the applicant pool to forty candidates. Dr. Richardson testified that:

-14-

[T]here are a couple of other things that are involved. . . . We're interested in diverse cultures and ethnic backgrounds. . . . Obviously, we're interested in qualified people of Hispanic and African American background. Everyone in psychology and counseling psychology is very sensitive to those issues and very concerned to get qualified minority students.[7]

---

[7] The quoted passage in the text, taken from Lesage's response to the state's reply to his motion for partial summary judgment, is a heavily edited condensation of Dr. Richardson's testimony. The actual, unedited exchange, reads as follows:

Q. [counsel for Lesage] Well, let's talk about -- And this is just real basic -- basic criteria you use, and let's just kind of start with this paring down process from 220 to 40. What criteria in the folder do you rely on most?

A. [Dr. Richardson] From the 40 to the 20 or the 200 to the 40.

Q. From the 220 to the 40 when you're making the initial cut. I mean, obviously G.R.E.

A. Well, let me see if I can summarize it intelligently. From the 220 or so to the 40, there are a great many folders that even though we try to look at them thoughtfully for a bit, they're clearly just completely out of the consideration, I mean, with very low G.R.E.s or very low grade point average or very sloppily done or something but typically G.R.E. and grades. So there is a great many of them. It's easy to weed out.

But you know, beyond that there is 100 or so, I guess, that require some thoughtful consideration. And I really don't know exactly how many. You know, there is a set of conventional criteria, G.R.E.s, grades, letters of recommendation, educational background that might include the quality of the school or major. And personal statement is an important, very important piece of the puzzle. So there is a set of conventional criteria like that we use, and people have to be fairly high on most of them, you know, strong on all but one or two and decent on those.

Q. To move up?

-15-

A.    To move up.  There is another consideration, and we try to evaluate by looking at letters on statements and background.  This is written in our literature.  And we want people who give evidence of interest in and aptitude for and personal qualities for counseling and psychotherapy work for professional psychology work.  Now, that is a necessary condition but not a sufficient one.

We're also interested in people who come across pretty strongly in that regard who have shown some spark of -- some potential for creative, professional or intellectual work of a special kind.  And that includes being interested in people who want to do things other than just be counselors and psychotherapists, who are interested in public service, public policy, what is sometimes called community psychology work, or who have research or theory interests of a special kind, professional or academic creativity and what is the word, originality, those two things.  So we look for that as well as the basic criteria.

Q.    Now, have you jumped ahead from cutting from the 220 to the 40 to talking more about how --

A.    No.

Q.    That is how --

A.    I keep expecting you to ask me some more things.  But, you know, there are a couple of other things that are involved.  We're very interested in people with diverse interests, backgrounds.  We're interested in diverse cultures and ethnic backgrounds.  We're interested in diverse life experiences.  We're interested in getting both males and females in the program.

I could lump all of those under the category, I guess, of diversity.  We're keenly interested in getting a diverse student body.  Occasionally, a capable handicapped person will apply.  There was one in recent years.

We have a handful of applications of people from other countries.  That is often very interesting, even Russia or China.  They usually look like very interesting people, but there are reasons why they probably wouldn't make it in a graduate school of this type, but that is not always the case.  We've accepted a couple of students in the last couple of years or two from Iceland, which has an

-16-

Despite this evidence, the district court granted the state's summary judgment motion, stating: "[T]he Court finds no evidence that race was a factor in the decision to deny Plaintiff's admission to the counseling psychology program. That is, the Court finds that Plaintiff cannot present a *prima facie* case of disparate treatment or disparate impact discrimination." In light of the state of the record and this Court's ruling in **Hopwood**, the district court erred by disposing of Lesage's claims in this fashion.

Just as in **Hopwood**, Lesage's central claim is that he was subjected to unconstitutional racial discrimination by the University's evaluation of his admissions application. *See* **Hopwood**, 78 F.3d at 938. Dr. Richardson's deposition testimony created a fact issue as to whether race was considered by the admissions committee during the first screening phase, while Lesage's application was still being considered. If race was considered before Lesage's application was rejected, Lesage has standing to challenge the admissions policy because his application may have been affected by the use of racial preferences. In that

interesting program of preparing people very well for graduate studies overseas.

Obviously, we're interested in qualified people of Hispanic and African American background. Everyone in psychology and counseling psychology is very sensitive to those issues and very concerned to get qualified minority students.

-17-

scenario, the University's consideration of race as an admissions criterion must be subjected to strict scrutiny analysis. *See, e.g., Adarand*, 515 U.S. at 227, 115 S. Ct. at 2113 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny."); *Croson*, 488 U.S. at 493-94, 109 S. Ct. at 721-22; *Dallas Fire Fighters*, 150 F.3d at 440-41; *Messer*, 130 F.3d at 135-36; *Hopwood*, 78 F.3d at 938, 940. "Diversity," the justification given for the University's use of racial preferences, is not a compelling state interest that satisfies the strict scrutiny standard for the purpose of admissions at a public university. *See Hopwood*, 78 F.3d at 944 ("[A]ny consideration of race or ethnicity . . . for the purpose of achieving a diverse student body is not a compelling interest under the Fourteenth Amendment."); *cf. Lutheran Church--Missouri Synod v. FCC*, 141 F.3d 344, 354 (D.C. Cir. 1998) ("We do not think diversity can be elevated to the 'compelling' level [in the context of the FCC's equal employment opportunity regulations], particularly when the Court has given every indication of wanting to cut back *Metro Broadcasting* [*Inc. v. FCC*, 497 U.S. 547, 110 S. Ct. 2997 (1990)]."), *petition for reh'g denied*, 1998 WL 611116 (D.C. Cir. Sept. 15, 1998), *petition for reh'g en banc denied*, 1998 WL 611112 (D.C. Cir. Sept. 15, 1998); *Taxman v. Board of Educ.*, 91 F.3d 1547 (3d Cir. 1996) (en banc) (declining to endorse diversity as an

appropriate justification for affirmative action programs in the employment context pursuant to Title VII), *cert. dismissed*, 118 S. Ct. 595 (1997).

Of course, when reviewing a summary judgment, a court must draw all reasonable inferences in favor of the nonmovant. *See, e.g.*, **Anderson**, 477 U.S. at 255, 106 S. Ct. at 2513. Dr. Richardson admitted in his deposition that race was used as a factor during the winnowing down of the pool of applications "from the 220 to the 40" -- a stage at which Lesage was indisputably still "in the mix." At oral argument, we asked counsel for the state to identify evidence in the record that might prove, despite Dr. Richardson's recollection at his deposition, that Lesage's application was eliminated from consideration before any other applicant benefitted from the admissions committee's racial preferences. Counsel provided no such example; neither has our review of the record discovered any such evidence. It logically follows that the district court erred by resolving a factual dispute at the summary-judgment stage and declaring that there was "no evidence that race was a factor in the decision to deny Plaintiff's admission to the counseling psychology program."[8]

---

[8] While we need not consider any evidence other than Dr. Richardson's deposition testimony in order to conclude that the district court erred by granting summary judgment, we note for the sake of completeness that the record contains further evidence to support Lesage's allegation of race-based discrimination. Significantly, some Black and Hispanic candidates were extended offers of admission and admitted to the program, even before the

-19-

Under these circumstances, given the genuine, material factual dispute as to when the University first used race as a criterion to choose or exclude candidates to the counseling psychology program in relation to the point in time at which Lesage was denied admission, it was error to grant summary judgment in favor of the state.

## B.

The State of Texas contends that despite its use of racial preferences in the admissions process for the University's counseling psychology program, it is nevertheless entitled to summary judgment because Lesage would not have been admitted to the program even if race had not been taken into consideration. This reasoning was supported by affidavits by Dr. Richardson and Dr. Ricardo Ainslie, both of whom served on the admissions committee for the counseling psychology program. Because no records relating to the admissions committee's evaluations at this stage were retained, the opinions expressed in these affidavits were based on a fresh, post-admissions review of the application pool, undertaken for the purposes of this litigation. These affidavits evaluated

first cut was even made. Lesage did not bring this specific evidence to the attention of the district court until he filed his motion for reconsideration of the court's grant of summary judgment. Because Dr. Richardson's deposition testimony, standing alone, is sufficient to create a factual issue that precluded summary judgment, we decline to address whether the district court abused its discretion by refusing to reconsider the entry of summary judgment in light of this additional evidence.

and criticized Lesage's application. Dr. Ainslie also compared Lesage's application to twenty-two "much stronger" applications, all of which, according to Dr. Ainslie, would have earned offers of admission before Lesage. The district court adopted this reasoning as an alternative holding supporting its decision to grant summary judgment in favor of the state. This argument, however, is simply irrelevant to the pertinent issue on summary judgment, namely, whether the state violated Lesage's constitutional rights by rejecting his application in the course of operating a racially discriminatory admissions program.

In *Hopwood*, even though the district court determined the state had proved that "legitimate, nondiscriminatory grounds exist[ed] for the law school's denial of admission to each of the four plaintiffs and that, in all likelihood, the plaintiffs would not have been offered admission even under a constitutionally permissible process," this did not result in an outright grant of summary judgment for the state. *Hopwood v. Texas*, 861 F. Supp. 551, 581 (W.D. Tex. 1994), *rev'd on other grounds*, 78 F.3d 932 (5th Cir.), *cert. denied*, 518 U.S. 1033, 116 S. Ct. 2581 (1996). The district court first determined liability and then turned to the competitiveness of the plaintiffs' applications on the question of damages. This was the proper ordering of matters before the court. The possibility that the *Hopwood* plaintiffs, or Lesage, would not have been offered admission is relevant only to the quantum of

-21-

damages available -- not to the pure question of the state's liability, which is the issue on summary judgment.

Assuming, as we must, that the state did indeed employ a racially discriminatory counseling psychology admissions program as alleged, those applicants who had not yet been eliminated from consideration at the time racially preferential criteria were applied have suffered an implied injury -- even if their applications ultimately would not have resulted in admission under a nondiscriminatory admissions regime. *See* **Hopwood**, 78 F.3d at 957. "The injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'" **Adarand**, 515 U.S. at 211, 115 S. Ct. at 2105 (internal citation omitted). Thus, even though the district court may have correctly predicted that Lesage suffered no direct injury and therefore incurred no compensatory damages, this scenario does not foreclose the availability of some other relief to which he may be entitled. The futility of Lesage's application was, therefore, an improper grounds for summary judgment.

### III.

For the foregoing reasons, we REVERSE the judgment of the district court. Because Lesage does not appeal from the denial of his motion for partial summary judgment, we REMAND for further proceedings.

REAVLEY, Circuit Judge, specially concurring:

This court's writing in Hopwood, upon which the instant judgment is reversed, was inconsistent with the judgment of the Supreme Court in Regents of the University of California v. Bakke, 438 U.S. 265; 98 S.Ct. 2733 (1978) and was unnecessary to the holding or judgment of the Hopwood court. This circuit court, however, considers that Hopwood writing to be binding law. I concur here in the judgment only.